FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHAEL STEPHEN COMBS,

*Petitioner-Appellant*,

v.

RON BROOMFIELD, California State Prison at San Quentin,

*Respondent-Appellee*.

No.19-99010

D.C. No. 2:05-cv-04777-ODW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted February 12, 2025
Pasadena, California

Filed March 12, 2026

Before: Consuelo M. Callahan, Bridget S. Bade, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Bade

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Michael Stephen Combs' 28 U.S.C. § 2254 habeas corpus petition challenging his conviction and death sentence for willful, deliberate, and premediated first-degree murder.

The district court granted a certificate of appealability on Combs' claims (including numerous subclaims) of ineffective assistance of counsel (IAC) during the penalty phase. Combs also argued cumulative error. He requested that the panel expand the certificate of appealability.

Because the California Supreme Court summarily denied Combs' claims on the merits and did not provide reasoning for its determination that Combs' claims failed to state a prima facie case, the panel independently reviewed the record to determine whether the state court's determination constituted an unreasonable application of clearly established federal law.

In an overarching claim of inconsistency with federal law in the determination of IAC claims based on the failure to present mitigating evidence, Combs argued that the California Supreme Court could have applied a "compelling connection" standard, which does not comport with the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) (requiring a court to "reweigh the evidence in aggravation against the totality of available mitigating

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidence"). Because the California Supreme Court issued a silent denial, the panel considered whether any reasonable argument supports the denial. The panel held that it is reasonable to conclude that the California Supreme Court correctly applied the *Strickland* prejudice standard when it summarily denied Combs' penalty-phase IAC claims. The panel therefore rejected Combs' blanket assertion that the California Supreme Court applied an improper state law standard that was contrary to, or an unreasonable application of, *Strickland*.

The panel concluded that the California Supreme Court could have reasonably determined that Combs failed to present a prima facie case for relief as to the twelve subclaims he asserted in connection with his certified claim of IAC at the penalty phase: failure to adequately investigate and present evidence of Combs' biological family background and social history; failure to provide adequate guidance and information to expert witnesses; allowing defense experts to testify that he had been diagnosed with antisocial personality disorder; failure to rebut argument that Combs lacked remorse; failure to present evidence that Combs was a follower; failure to present a substance abuse expert; providing a court-appointed expert's report to defense experts and the prosecution, thus opening the door to harmful testimony; failure to properly respond to jury questions; failure to request a limiting instruction on victim impact testimony; failure to object to a suggestion that Combs would be thrilled to receive a life sentence; failure to rebut aggravating evidence of prior convictions; and failure to present mitigating evidence.

The panel concluded that the California Supreme Court likewise could have reasonably determined that Combs failed to present a prima facie case of cumulative

prejudice. The panel rejected Combs' argument that the California Supreme Court and the district court erred by failing to hold evidentiary hearings on his penalty-phase IAC claims.

Combs requested that the panel expand the certificate of appealability to cover two claims. In the first, he asserted several subclaims based on his competence, including that his procedural and substantive due process rights were violated because he was incompetent, the trial court failed to order a second competency hearing sua sponte, and trial counsel was ineffective for failing to request additional competency hearings. In the second, he asserted that his Sixth Amendment rights were violated by juror bias. The panel denied a certificate of appealability for Combs' substantive and procedural due process competency subclaims, his subclaim alleging ineffective assistance based on counsel's failure to request a second competency hearing during the guilt phase of trial, and his claim of juror bias. The panel granted a certificate of appealability on Combs' subclaim that counsel was ineffective for failing to request a second competency hearing at the penalty phase, but affirmed the district court's denial of that subclaim.

---

## COUNSEL

C. Pamela Gomez (argued), Susel B. Carrillo-Orellana, and Nicole Jeong, Deputy Federal Public Defenders; Cuauhtémoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Sharon L. Rhodes (argued) and Lise Jacobson, Deputy Attorneys General; Holly D. Wilkens, Supervising Deputy Attorney General; James W. Bilderback II, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Diego, California; for Respondent-Appellee.

---

**OPINION**

BADE, Circuit Judge:

In 1993, in California state court, a jury found Petitioner Michael Stephen Combs guilty of the willful, deliberate, and premeditated first-degree murder of Janine Lee and returned a sentence of death. After the state courts denied Combs relief on direct appeal and in post-conviction proceedings, he filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Central District of California. The district court denied the petition and granted a certificate of appealability on Combs' claims of ineffective assistance of counsel during the penalty phase. Combs appeals the district court's denial of habeas corpus relief, and he requests that we expand the certificate of appealability. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We grant the request to expand the certificate of appealability in part and deny it in part, and we affirm the denial of federal habeas relief.

## I.   Factual Background

### A. The Lee Robbery and Murder, and the Police Investigation

On the evening of October 24, 1990, Janine Lee was found dead in Odessa Canyon near Calico Ghost Town in California.[1] *People v. Combs*, 101 P.3d 1007, 1012–13 (Cal. 2004). Lee's wrists were bound with a green nylon cord and her upper body, including her head and neck, had multiple bruises, cuts, and abrasions. *Id.* at 1013. Her neck had a "ligature imprint," and bone was visible on the left side of her face. *Id.* The forensic evidence indicated that the primary cause of death was strangulation, and the secondary cause was blunt force trauma to her head. *Id.* The police found an electrical cord that matched the ligature mark on Lee's neck on the road leading to Odessa Canyon. *Id.* The cuts, bruises, and abrasions indicated that Lee struggled as she was strangled. *Id.*

In October 1990, Combs lived in Barstow, Arizona where he was a karate instructor at the Desert Rose Center for the Arts. *Id.* at 1012–13. After he attempted to cash several checks written on the account of a former Desert Rose employee, he was charged with two counts of check forgery and released on his own recognizance pending trial. *Id.* at 1013. On October 23, 1990, Combs appeared in court on the forgery charges, and, on his request, the court continued the preliminary hearing for two weeks. *Id.*

Lee worked with Combs at Desert Rose. *Id.* at 1013. On October 24, 1990, after another employee refused his request

---

[1] The facts are derived from the California Supreme Court's decision on direct appeal. *People v. Combs*, 101 P.3d 1007 (Cal. 2004). The parties do not dispute these facts.

for a ride, Combs asked Lee to drive him and Cynthia Purcell to the Calico Ghost Town where he claimed he was meeting a friend. *Id.* at 1012, 1014. Lee agreed, and left her father's house in her car around 7:30 p.m. *Id.* at 1012–13.

That evening, at about 9:00 p.m., a man camping near the Calico Ghost Town saw a car drive into a nearby canyon and stop close to his trailer. *Id.* at 1013. Using a magnified spotting scope, he saw a man and woman exit the car, open the trunk, walk around the area, and then return to the car and drive further into the canyon. *Id.* The next morning, Lee's father reported to law enforcement that someone had tried to cash a check on his joint account with Lee. *Id.*

Several days later, on November 2, 1990, Combs and Purcell were in a car accident in Kingman, Arizona. *Id.* at 1014. While investigating the accident, the officer received a dispatch about a homicide and car theft in California. *Id.* Combs matched the description of one of the homicide suspects, the car involved in the accident matched the description and license plate number of Lee's stolen car, and there was splattered blood in the car. *Id.* at 1013–14. After the officer arrested Combs and Purcell, he searched the car and found a flashlight that was consistent with the blunt force trauma to Lee's head, and a green nylon cord that was consistent with the cord that had been used to bind Lee's wrists. *Id*. at 1014–15. The officer also found a wallet containing Lee's business card, her checkbook, and a check made payable to Combs with Lee's name on the signature line. *Id.* at 1014.

The day of his arrest, Combs waived his constitutional rights and spoke with San Bernadino County detectives. *Id.* He initially denied knowledge of Lee's murder but later confessed in a recorded interrogation that he and Purcell had

strangled and beaten Lee to death and stolen her money and car. *Id.* at 1014–15. He admitted that he and Purcell spent several days considering potential victims for the robbery and murder before choosing Lee. *Id.* at 1014.

Combs said he planned the killing and told Purcell what to do. *Id.* at 1014–15. He provided numerous details about the murder, including how he and Purcell tricked Lee into driving them to the Calico Ghost Town and how he used his martial arts training to kill Lee. *Id.* He described in detail how he and Purcell restrained Lee in the driver's seat of her car, strangled her from behind with an electrical cord wrapped around her neck, and hit her in the head with a flashlight and with rocks that they wrapped in Lee's jacket. *Id.* at 1015.

Combs also described searching Lee's purse for money, taking her checkbook, and then disposing of her body near Odessa Canyon and driving away in Lee's car. *Id.* He also admitted to trying to cash several checks from Lee's account. *Id.* Combs said that he was sober when he planned the robbery and murder and when he chose Lee as the victim, but he used methamphetamine about four hours before he contacted Lee on October 24, 1990. *Id.*

Detectives asked Combs if he regretted his actions, and he expressed regret that Lee did not have any money, stating that the murder would have been "worth it" only if she had between $5,000 to $10,000. *Id.* Combs also said he tried not to think about the killing afterward and he and Purcell laughed about it. *Id.*

On November 8, 1990, the detectives and other officers transported Combs and Purcell to California. *Id.* During the drive, Combs and Purcell agreed to a videotaped reenactment of the crime using Lee's car in Odessa Canyon.

*Id.* A detective advised Combs and Purcell of their rights before Combs walked the officers through the reenactment, with Purcell corroborating many aspects of the account. *Id.* at 1016.

## B. The Guilt Phase of the Trial

Combs and Purcell were charged with Lee's murder and tried separately. *Id.* at 1012 n.2. At trial, defense counsel admitted that Combs and Purcell had killed Lee but argued that Combs lacked the mental ability to form the requisite mental states for first-degree murder, including specific intent, premeditation, deliberation, and malice aforethought. *Id.* at 1016. The defense relied on the testimony of clinical psychologist Francis Crinella, Ph.D. *Id.* Dr. Crinella testified that testing showed that Combs had "chronic brain syndrome," and "the elements of two psychiatric disorders," specifically schizophrenia and borderline personality disorder. He said he could not opine on Combs' intent at the time of the crimes, but he opined that Combs' mental disorders influenced his actions. *Id.*

On cross-examination, Dr. Crinella testified that Combs knew right from wrong at the time of the crime. *Id.* Dr. Crinella acknowledged that other doctors had diagnosed Combs with antisocial personality disorder or an older analogous diagnosis, psychopathic or sociopathic personality disorder. *Id.* He also acknowledged that Combs described experiencing an adrenaline rush from killing Lee that lasted three days and that he described the killing as the "ultimate high." *Id.*

On February 25, 1993, the jury found Combs guilty of willful, deliberate, and premeditated first-degree murder, and found as true special circumstances that Combs committed the murder while on release on his own

recognizance pending other charges, he laid in wait, and murdered Lee in the commission of a robbery.

## C.  The Penalty Phase of the Trial

At the penalty phase, the prosecution presented evidence of Combs' prior offenses, including two juvenile adjudications for armed robbery with the use of a knife, and prior adult felony convictions for attempted second-degree burglary, attempted vehicle theft, check forgery, and attempted escape from incarceration.  *Combs*, 101 P.3d at 1016.  The prosecution also presented evidence that, on three separate occasions while Combs was in jail before and during trial, he threatened force or violence against himself and others with handmade weapons.  *Id.*  A jail nurse, Robin Hunt, testified that Combs told her he was planning to stage threats to harm himself and others to manipulate staff and to be diagnosed with a mental illness.

The defense presented numerous lay and expert witnesses who testified about Combs' social history, learning disabilities, difficulty in school, and medical and psychiatric history—including inpatient treatment and mental impairments.  *Id.* at 1016–17.  Combs' relatives, former teachers, and mental health experts testified that Combs was adopted and subsequently abandoned by his adoptive family.  *Id.* at 1016.  Other witnesses testified about Combs' admission to Bethesda Psychiatric Hospital for inpatient treatment in 1983 when he was seventeen.  *Id.*  Combs' treating physician at Bethesda, John Graves, M.D., evaluated Combs in connection with the penalty phase, and diagnosed him with post-traumatic stress disorder, a mixed-type personality disorder, and complicated bereavement.  *Id.* at 1016–17.  Dr. Graves further opined that Combs' intoxication with amphetamines aggravated his manic-

depressive illness. *Id*. at 1017. Robert Poor, a licensed marriage, family, and child counselor, testified about his treatment of Combs in 1986 at Halcyon Center, a psychiatric crisis residential facility.[2] *Id.*

Clinical psychologist Edward Fischer testified about a battery of tests conducted on Combs. *Id.* He opined that the testing showed signs of "brain dysfunction" that Combs had at birth or developed at an early age, as well as schizophrenia and mania. *Id.* He disagreed with Dr. Graves' finding that Combs exhibited signs of depression. *Id.*

Dr. Crinella testified that diagnostic tests showed abnormalities and lesions in Combs' brain, and he agreed with Dr. Fischer that Combs suffered from organic brain syndrome, which occurred either prenatally or early in life. *Id.* He opined that fetal alcohol syndrome or prenatal exposure to drugs through Combs' biological mother were possible causes of the brain lesions.

The jury returned a verdict of death. In June 1993, the trial court denied Combs' motion for a new trial and to reduce sentence and imposed the death penalty.

## II. Procedural History

In December 2004, the California Supreme Court affirmed Combs' conviction and death sentence on direct appeal. *Combs*, 101 P.3d at 1012. The United States Supreme Court denied Combs' petition for writ of certiorari in June 2005. *Combs v. California*, 545 U.S. 1107 (2005). In 2005, Combs filed his first petition for writ of habeas corpus in the California Supreme Court. After the

---

[2] The California Supreme Court mistakenly referred to Poor as a doctor, but his credentials and testimony established that he held a master's degree in psychology. *Id.* at 1017.

appointment of counsel, he filed an amended petition.  In July 2012, the California Supreme Court deemed two claims premature and denied them without prejudice, summarily denied all remaining claims on the merits, and further concluded that multiple claims were procedurally barred.

In July 2013, Combs filed a first amended petition for writ of habeas corpus under 28 U.S.C. § 2254, the operative petition in this matter.  In October 2019, the district court denied habeas corpus relief, entered judgment, and granted a certificate of appealability for two of Combs' claims of ineffective assistance of counsel during the penalty phase, which it later expanded to include all of Combs' penalty-phase ineffective assistance claims.  The district court subsequently granted the State's motion to correct errors and entered an amended order denying the petition.  Combs timely appealed to this court, asserting certified and uncertified claims.  We ordered supplemental briefing on the uncertified claims.

## III.  Standards of Review

We review de novo a district court's grant or denial of habeas relief. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010).  Because Combs filed his original § 2254 petition after 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) governs our review. *See* 28 U.S.C. § 2254(d).  Under AEDPA, we defer to a state court's decision on any claim that was adjudicated on the merits unless the decision was  (1) "contrary  to,  or  involved  an  unreasonable application  of,  clearly  established  Federal  law,  as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light  of  the  evidence  presented  in  the  State  court proceeding." *Id.*   This  standard  of  review  is  "highly

deferential." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). To obtain relief, the petitioner must show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Here, we apply AEDPA deference to the California Supreme Court's decision on the merits summarily denying Combs' claims. *Ochoa v. Davis*, 50 F.4th 865, 888 (9th Cir. 2022). Because the court summarily denied Combs' petition, it necessarily determined that none of his claims stated a prima facie case for relief. *See Cullen v. Pinholster*, 563 U.S. 170, 188 n.12 (2011) (recognizing that "[u]nder California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief," and noting that "[i]t appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations." (citing *People v. Duvall*, 886 P.2d 1252, 1258 (1995)); *Michaels v. Davis*, 51 F.4th 904, 940 n.17 (9th Cir. 2022).

When, as here, a state court summarily denies relief, a petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision." *Pinholster*, 563 U.S. at 187–88 (quoting *Richter*, 562 U.S. at 98). Thus, when a state court rules on a petition summarily, "a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Even if we would grant federal habeas relief on de novo review, when there are "arguments that would otherwise justify the state court's result," § 2254(d) precludes relief. *Id.*

Because the California Supreme Court summarily denied Combs' claims on the merits and did not provide reasoning for its determination that Combs' claims failed to state a prima facie case, we independently review the record to determine whether the state court's determination constituted an unreasonable application of clearly established federal law. *See Greene v. Lambert*, 288 F.3d 1081, 1088–89 (9th Cir. 2002). Combs has the burden of showing that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

## IV.   Certified Claims

Combs asserts a certified claim of penalty-phase ineffective assistance of counsel with numerous subclaims. He also argues cumulative error. We review Combs' claims of ineffective assistance to determine if the state court's decision violated the controlling, clearly established federal law for such claims, as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (explaining that, for purposes of § 2254(d)(1), "clearly established" means the holdings of the Supreme Court's "decisions as of the time of the relevant state-court decision" (citation omitted)).

## A. Clearly Established Federal Law Governing Ineffective Assistance of Counsel Claims

A defendant has a Sixth Amendment right to the effective assistance of counsel at the guilt and penalty phases of a capital trial. *Strickland*, 466 U.S. at 684–87. To establish a claim of ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (citation omitted). When considering this factor, the court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). Counsel's strategic decisions are owed deference if they were "made after counsel has conducted 'reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary.'" *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc) (alteration in original) (quoting *Strickland*, 466 U.S. at 691). The Supreme Court has not "articulate[d] specific guidelines for appropriate attorney conduct" but has instructed that the reasonableness of counsel's actions is assessed under the prevailing professional norms at the time of the challenged actions, *Wiggins v. Smith*, 539 U.S. 510,

521 (2003) (citation omitted), and in view of "counsel's perspective at the time," *Strickland*, 466 U.S. at 689.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citation omitted). The *Strickland* standard sets a "high bar" for relief. *Id.* at 105 (citation omitted). And when a claim of ineffective assistance of counsel is reviewed under AEDPA, the relevant question is whether the state court's decision involved an unreasonable application of *Strickland*'s principles. *Id.*

## B. Overarching Claim of Inconsistency with Federal Law

As an initial matter, Combs argues that the California Supreme Court's determination of *all* his penalty-phase claims of ineffective assistance was contrary to, or based on, an unreasonable application of, *Strickland*.

Specifically, Combs asserts that California's legal standard for claims of ineffective assistance of counsel based on the failure to present mitigating evidence is inconsistent with the standard set forth in *Strickland*. Combs argues that California law requires a petitioner to establish a "compelling connection" between the mitigating evidence that counsel failed to present and the crime at issue to demonstrate ineffective assistance of counsel. He argues that this state-law requirement limits what a court can consider and thus does not comport with *Strickland*, which requires a

court to "reweigh the evidence in aggravation against the *totality* of available mitigating evidence" to determine whether counsel's deficient performance during a capital penalty-phase prejudiced the defendant. *Wiggins*, 539 U.S. at 534 (emphasis added).

Combs cites *In re Ross*, 892 P.2d 1287, 1305 (Cal. 1995), *In re Avena*, 909 P.2d 1017, 1042 (Cal. 1996), *In re Andrews*, 52 P.3d 656, 672 (Cal. 2002), and *In re Champion*, 322 P.3d 50, 82 (Cal. 2014), and argues that, because the California Supreme Court applied a "compelling connection" standard in these cases, we therefore must presume that the California Supreme Court applied the "compelling connection" standard in Combs' case when it summarily denied his penalty-phase ineffective assistance claims.

But even if Combs is correct and the California Supreme Court has at times applied such a standard, we are not required to presume that it applied that standard when it summarily denied Combs' penalty-phase claims of ineffective assistance of counsel. *See Richter*, 562 U.S. at 98. Combs, citing *Richter*, recognizes that because the California Supreme Court issued a silent denial, we must "consider whether any reasonable argument supports the denial." Under *Richter*, Combs has the burden to show that "there was *no reasonable* basis for the state court to deny relief." 562 U.S. at 98, 102 (emphasis added).

Combs asserts the California Supreme Court could have applied a "compelling connection" standard, which he argues is contrary to, or an unreasonable application of, *Strickland*. But it is also reasonable to conclude that the California Supreme Court correctly applied the *Strickland* prejudice standard when it summarily denied Combs'

penalty-phase ineffective assistance claims. Indeed, in *Ross v. Davis*, we reviewed the petitioner's conviction and IAC claims and concluded that habeas relief was not warranted because the California Supreme Court "properly reweighed the old and new mitigating evidence against the existing aggravating evidence." 29 F.4th 1028, 1034, 1063, 1066 (9th Cir. 2022); *see Ross*, 892 P.2d at 1305 (comparing the trial as it occurred "with the trial it would have been with the mitigating evidence," and finding no prejudice) (citation omitted).

Accordingly, we reject Combs' blanket assertion that the California Supreme Court applied an improper state law standard that was contrary to, or an unreasonable application of *Strickland* when it denied his penalty-phase ineffective assistance claims.

## C. Ineffective Assistance Based on Failure to Investigate

In his first subclaim, Combs asserts a violation of his Sixth Amendment right to the effective assistance of counsel at the penalty phase based on counsel's alleged failure to adequately investigate and present evidence of Combs' biological family background and social history.

"To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[] and explain[] the significance of all the available [mitigating] evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 393, 399 (2000)). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691.

Whether strategic judgments are owed deference depends on the "adequacy of the investigations supporting those judgments." *Wiggins*, 539 U.S. at 521. Counsel's "strategic choices made after thorough investigation" are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

As set forth in detail in the following discussion, the California Supreme Court could have summarily denied Combs' claim at *Strickland*'s performance prong by determining that Combs did not state a prima facie case for relief based on counsel's alleged failure to adequately investigate Combs' biological family background and social history, including a failure to adequately search for his biological mother.

### 1. *Failure to Investigate and Locate Combs' Biological Mother*

Combs argues that trial counsel failed to conduct an adequate search for his biological mother, which could have resulted in the discovery of evidence that he suffered prenatal abuse that resulted in several fetal alcohol spectrum disorders and organic brain damage that diminished his decision-making capacity.

But the record demonstrates that this is not a case where counsel conducted a cursory investigation of potential mitigating evidence or ignored obvious leads. *Cf. Porter v. McCollum*, 558 U.S. 30, 38–40 (2009) (per curiam) (concluding that counsel was ineffective for failing to obtain any "school, medical, or military service records or interview any" of the petitioner's family members); *Williams*, 529 U.S. at 395–96 (concluding that counsel was ineffective for failing to investigate extensive records detailing the petitioner's "nightmarish childhood," not for a strategic reason, but because they mistakenly believed "state

law barred access" to them). Nor did counsel investigate some mitigating evidence but then fail to search for additional evidence. *Cf. Rompilla v. Beard*, 545 U.S. 374, 381–83 (2005) (determining that counsel was ineffective when counsel conducted some investigation of the defendant's background but then failed to review school and incarceration records or investigate the defendant's alcohol dependence, despite evidence that doing so may have led to helpful mitigation evidence). Rather, trial counsel conducted an adequate investigation and search for Combs' biological mother.

First, in an undated memorandum, defense investigator Elmer Webb advised counsel that he had learned (1) the identities of Combs' biological parents (Shirley Ann Standard and Joseph Edward Standard), (2) his biological mother's birthdate, (3) his biological mother's maiden name (Langston), (4) his biological parents' address at the time of Combs' birth (a mobile home park in Burbank, California, that no longer existed at the time of the investigation), and (5) that his biological parents were separated at the time of Combs' birth. Webb followed leads for two people named Shirley Ann Standard and two people named Joseph Edward Standard in California, but these leads were "negative" for a relation to Combs.

Second, on November 23, 1992, about a week before the initial jury selection process began, counsel filed an ex parte application for a subpoena duces tecum requesting Combs' birth records to investigate his biological mother's medical history. The application included her name and birthdate that counsel had previously discovered. The trial court granted the application the same day. Webb subpoenaed Shirley Ann Standard's complete medical records under her married and maiden names. Combs faults counsel for not

subpoenaing the records sooner, but Webb's memorandum states that the records he received "revealed much of the same information [Webb] *had received earlier*."

Third, Webb also investigated driver's licenses in California and learned that a Shirley Ann Standard had surrendered a California license upon the issuance of a Wisconsin license in "late 1990." Webb followed this lead and learned that a Shirley Ann Standard had lived in Wisconsin Rapids, Wisconsin, but might have moved to Tomahawk, Wisconsin and remarried, taking the name Shirley Ann Miller.

Fourth, Webb continued the investigation by traveling to Tomahawk, Wisconsin, but he found no trace of Shirley Ann Miller or her husband there. He also visited the address in Wisconsin Rapids, Wisconsin that appeared on Shirley Ann Miller's Wisconsin driver's license and found a trailer park. Donna Webb, Webb's widow and his paralegal in the Combs' case, confirmed they visited the address but found an empty space where a trailer should have been. A resident of the trailer park told them Shirley Ann Miller had gone to Texas. The Webbs' usual practice would have been to search for Shirley Ann Miller in Texas, but they did not do so. Donna speculated that they stopped the search at that point due to time or monetary constraints.

Even if defense counsel stopped the search due to time or financial constraints related to Combs' trial, doing so did not fall below an objective standard of reasonableness considering that the investigators had already followed several fruitless leads and were not certain the person they were tracking was Combs' biological mother. *See Murray v. Schriro*, 882 F.3d 778, 822–25 (9th Cir. 2018) (determining that counsel's performance was neither

deficient nor prejudicial when counsel "made reasonable efforts to locate" a potentially exculpatory witness, tracked the witness to a Veteran's Administration facility in California, but failed to contact or interview the witness).

Combs faults the investigators for failing to check driver's licenses or social security records in Texas. But he fails to point to evidence available at the time of the search showing Shirley Ann Miller had a driver's license or a job in Texas.[3] In her deposition submitted in Combs' state habeas proceedings, Shirley Ann Miller stated that Combs' post-conviction counsel told her "[y]ou're the hardest lady to catch up with." The declaration of her sister, Barbara Macy, also suggests Shirley Ann Miller would have been difficult to locate before the penalty phase of trial. Macy saw her sister a few times between 1967 and 2001, when she asked for help and then disappeared.

### 2.  *Failure to Investigate Family History of Mental Illness*

Combs argues that, aside from the investigation of his biological mother, counsel's investigation of his biological family's history of mental illness was also deficient. This argument is unpersuasive because, in addition to searching for Combs' biological mother, counsel investigated other aspects of Combs' background and introduced the mitigating

---

[3] In her declaration submitted in the state habeas proceedings, Shirley Ann Miller recalls that "[i]n approximately 1993," she and her husband stayed in her sister's garage apartment in Brownwood, Texas, and moved to Oregon in 1994. She did not have a job when she was in Texas. She believed she obtained a Texas driver's license in the summer of 1993, or possibly in the spring. The jury reached its verdict in the guilt phase of Combs' trial on February 25, 1993, and in the penalty phase on April 15, 1993.

evidence he discovered during the penalty phase, including evidence of Combs' difficulties in school, cognitive impairment, mental illness, and organic brain dysfunction.

Counsel also presented testimony from several medical providers and experts who discussed Combs' history of inpatient treatment for his mental impairments, his psychological and neuropsychological assessments, and various test results. *See, e.g.*, *Combs*, 101 P.3d at 1016–17. On counsel's request, the trial court appointed mental health professionals to evaluate Combs, including Drs. Harvey Oshrin, Francis Crinella, Edward Fischer, and John Graves. These mental health professionals administered various "neuropsychological tests," ordered imaging (including an MRI and an EEG), examined Combs, and reviewed "extensive" records about Combs that predated 1990. One of these appointed experts, Dr. Crinella, testified that Combs likely sustained brain damage early in life, perhaps before birth.[4] He also opined that Combs had schizophrenia, borderline personality disorder, and organic brain syndrome, which influenced his actions.

Dr. Graves, a psychiatrist who treated Combs in 1983 and was one of his court-appointed experts, concluded that Combs suffered from PTSD, a mixed-type personality disorder, and complicated bereavement. He opined that, at the time of Lee's killing, Combs was intoxicated with amphetamines, which aggravated his manic depression. He also concluded that Combs' mental illness prevented him from considering the consequences of his actions. Dr.

---

[4] The jury was instructed that it could consider all the evidence that was received during any part of the trial in determining the penalty, which included Dr. Crinella's guilt-phase testimony.

Graves believed Combs' father had physically and emotionally abused him.

Based on his testing and evaluation of Combs, Dr. Fischer, another appointed expert, concluded that Combs had organic brain dysfunction and a learning disability, which he was either born with or developed early in life. Dr. Fischer diagnosed Combs with borderline personality disorder with some antisocial traits and found that he had symptoms of schizophrenia and mania. Dr. Fischer opined that Combs' drug use influenced him to do something he would not have done otherwise.

During the penalty-phase closing argument, counsel acknowledged that, other than Combs' placement in "up to five" foster homes, he lacked information about Combs before his adoption when he was eighteen months old. Counsel, however, emphasized the voluminous information the defense had presented about Combs' hardships as a child, including his foster placements and observations from teachers and medical providers that he exhibited some form of developmental disability or "brain damage" in his early years.

Counsel also focused on Combs' hardships within his adoptive family, including his adoptive mother's death from cancer when Combs was young and the indifference of his adoptive father, who left for a short time after Combs' mother died and who may have impeded Combs' inpatient treatment. Counsel also highlighted Combs' inpatient treatment for his mental disorders, his misbehavior as a juvenile and his juvenile charges, and his adult run-ins with the law. Counsel's closing arguments thus reflected a strategic decision, made after his reasonable investigation, to focus on Combs' life after he was adopted when he was

eighteen months old. *See Cox v. Ayers*, 613 F.3d 883, 899 (9th Cir. 2010) (deferring to counsel's choices made after a reasonable investigation); *cf. Miles v. Ryan*, 713 F.3d 477, 490–92 (9th Cir. 2013) (determining that counsel was not ineffective for failing to conduct a more thorough investigation of the petitioner's social background when counsel performed some investigation and made a strategic choice to present mitigating evidence of a normal life that fell apart after personal traumas).

Considering defense counsel's unsuccessful efforts to locate Combs' biological family and counsel's investigation of Combs' social history, education, and medical background, counsel's strategic decision to focus on Combs' life after his adoption when he was eighteen months old, while highlighting potential mitigation information about Combs' early years, did not fall below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The California Supreme Court could have reasonably determined that Combs failed to make a prima facie case of deficient performance and thus denied this claim of ineffective assistance without reaching *Strickland*'s prejudice prong. *See In re Clark*, 855 P.2d 729, 741–42, 749 (Cal. 1993); *see also Pinholster*, 563 U.S. at 188 n.12 (explaining that the California Supreme Court summarily denies relief when a petitioner fails to demonstrate a prima facie case for relief); *see also Strickland*, 466 U.S. at 700 (stating that a court may dispose of a claim of ineffective assistance of counsel if a petitioner fails to satisfy either part of the two-part test). Therefore, Combs has not met his burden of showing that there was no reasonable basis for the California Supreme Court's decision or that its decision was so erroneous it was "beyond any possibility of fair-minded disagreement." *Richter*, 562 U.S. at 103.

### 3.  *Failure to Prepare Lay Witnesses*

As part of Combs' first ineffective assistance subclaim asserting that counsel failed to adequately investigate his biological family background and social history, Combs contends that trial counsel failed to adequately prepare lay witnesses, which resulted in "ill-prepared" lay witnesses providing testimony that was "more aggravating than mitigating."

As examples, Combs discusses high school teacher Robert Reed's testimony that Combs had an attitude problem and his adoptive family members' testimony that he stole from them.  Combs contends that "[h]ad counsel properly interviewed and prepared their witnesses they would have contextualized these incidents in direct or redirect examination."  The State argues that Combs did not present this claim to the state court or the district court and, therefore, it is unexhausted and not properly before us on habeas review.  Combs argues that the facts supporting the claim were part of the trial record and simply form new arguments "supporting the much larger IAC claim that Combs presented on state and federal habeas that trial counsel was ineffective at the penalty-phase."

We need not resolve whether Combs properly presented this subclaim to the state and district courts because, even if considered on the merits, Combs' conclusory assertions fail to establish a basis for habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.") (citation omitted); *Gallegos v. Ryan*, 820 F.3d 1013, 1035 (9th Cir. 2016) (concluding that a petitioner's "speculative assertions" that additional

preparation for cross-examination of a witness could have helped the defense were "unpersuasive").

Moreover, counsel contextualized the testimony of Reed and Combs' adoptive family members as part of the broader theory that Combs faced hardships in his youth, had difficulties in school, and stole from his family because he was unable to cope with the death of his adoptive mother. *See Combs*, 101 P.3d at 1016–17. Reed advanced the defense's theory with his testimony that Combs was a slow learner with consistently below average IQ scores and that Combs' adoptive father rejected recommended counseling and support, including around the time Combs' adoptive mother died, which contributed to Combs' difficulty in school. His family members' testimony also supported this narrative. For example, Combs' sister testified about his difficulty in school, and his aunt testified that he was "slow" and aloof, that he was in special education at school, and that his father was "ashamed" of Combs and was "too stern" with him. His aunt also testified that the family did not "pay much attention" to Combs because they primarily focused on his disabled brother Christopher.

To the extent portions of the testimony given by Reed and Combs' family members on cross-examination were damaging, Combs fails to show how additional preparation of these lay witnesses would have changed their testimony. Combs has not overcome the deference owed to trial counsel's strategic decision to present these lay witnesses who provided testimony that supported the defense's theory. *See Lopez v. Allen*, 47 F.4th 1040, 1050–51 (9th Cir. 2022) (determining that trial counsel's handling of witnesses, including witnesses with mixed testimony, was a matter of strategy entitled to deference). Accordingly, the California Supreme Court could have reasonably determined that these

conclusory assertions did not state a prima facie case of ineffective assistance of counsel. *See Pinholster*, 563 U.S. at 188 n.12; *see also Clark*, 855 P.2d at 741–42, 749.

### D. Ineffective Assistance Based on Failure to Prepare Expert Witnesses

In his second subclaim, Combs asserts that counsel provided ineffective assistance at the penalty phase by failing to provide adequate guidance and information to expert witnesses. The defense presented the testimony of three mental health experts, Dr. Graves, Dr. Fischer, and Dr. Crinella. Combs challenges counsel's preparation of these experts to evaluate Combs and provide mitigation testimony.

### 1. *Combs has not Shown Deficient Performance*

"Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) (citation omitted). Additionally, to "perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[] and explain[] the significance of all the available [mitigating] evidence.'" *Mayfield*, 270 F.3d at 927 (alterations in original) (quoting *Williams*, 529 U.S. at 393, 399). The failure to provide experts with "necessary information" that they requested may also constitute deficient performance. *Bean*, 163 F.3d at 1079.

First, Combs argues that the defense experts indicated that they needed additional information about Combs' biological family, but because counsel failed to adequately investigate Combs' biological family, counsel could not provide sufficient information to the experts to enable them

"to adequately evaluate Combs, and to adequately prepare them to testify." As support, Combs points to Dr. Crinella's testimony that it was important "that genetics be looked at," counsel's question about whether Dr. Crinella's evaluation was "possibly" hindered by the inability to find Combs' "natural parents and ancestors," and Dr. Crinella's response that because there was evidence of "lesions in the brain," the basis for Combs' disorders was "less speculative." Contrary to Combs' assertion, Dr. Crinella did not testify that he requested but was denied information about Combs' background. And even if Dr. Crinella requested such information, as set forth above in Part IV.C, Combs has not demonstrated that counsel performed deficiently in investigating and trying to locate Combs' biological family.

Second, Combs argues that counsel did not adequately prepare the defense experts to testify at trial. The record does not support this assertion. As the district court found, Dr. Crinella stated that the experts did not "go through formal expert witness preparation" before trial, but he acknowledged that he talked "extensively" with defense counsel about the case. At the penalty-phase hearing, Dr. Crinella testified that, to prepare for his testimony, he reviewed reports from multiple doctors who were either part of a team Dr. Crinella "put together" or who had otherwise evaluated Combs, including Drs. Forbes, Kania, Oshrin, Hunt, Fischer, Nudleman, Aleksandra, and DeMet. Dr. Crinella also testified that he had "several" conferences with trial counsel and Dr. Fischer and that he participated in a joint conference with counsel and testifying expert Dr. Graves the weekend before the experts testified. Dr. Graves testified that he conferenced with trial counsel and Drs. Crinella and Fischer before he testified at the penalty phase.

Combs further argues that counsel's failure to prepare the experts prevented counsel from eliciting testimony from them that was necessary to understand Combs' mental impairments, "including the correlation between Combs' EEG and MRI results and [his] impulsive, aggressive behavior."   But Dr. Graves testified that he reviewed "extensive" reports and records, including Combs' EEG and MRI results, the evaluations of Drs. Fischer and Crinella, and numerous other reports regarding Combs' mental health and background.

Combs also relies on Dr. Graves' 2006 declaration in which he stated that counsel failed to provide him with treatment notes from Halcyon Center.   But when asked during trial whether he reviewed records from Combs' "hospitalization" at the Halcyon Center, Dr. Graves responded, "Yes, I did."   Additionally, based on his review of those records, he testified about Combs' treatment at the Halcyon Center.

Combs argues that the circumstances here are like those in *Bean*, where we concluded that counsel was ineffective when defense experts' requests for "necessary information" were denied, "when testing requested by expert witnesses [was] not performed, and when experts [were] placed on the stand with virtually no preparation or foundation."  163 F.3d at 1079.

In *Bean*, prior to trial, two mental health experts "strongly recommended further neuropsychological testing to elucidate the impact of organic brain damage on Bean's cognitive functioning." *Id.* at 1078.  The testing the experts requested was not performed until the "weekend immediately preceding the penalty phase," and counsel, therefore, did not have the results before the penalty phase

began. *Id.* In addition, one of the experts requested information about "Bean's offenses and his social, medical, and educational history," but counsel did not provide any information other than the report of the neurological testing that was performed immediately before the penalty phase. *Id.* Counsel also failed to contact a testifying expert to prepare him "until a day or two" before his testimony, and the two met for "only one or two hours." *Id.*

In contrast, the record here does not show that any penalty-phase expert was denied information that was necessary for the expert to form an opinion about Combs' mental impairments. Instead, as set forth above, the record shows that counsel provided the penalty-phase experts with extensive background evidence and conferred with the experts regarding their testimony.

Third, Combs argues that counsel was deficient for allowing the experts to testify despite "knowing that they would contradict each other's conclusions." Combs is apparently referring to the experts' different theories regarding the "root cause(s) of [his] mental deficits." The penalty-phase experts addressed these seeming inconsistencies during their testimony. For example, Dr. Graves testified that when he treated Combs at Bethesda Hospital in 1983, he diagnosed Combs with major depression, bipolar-type, and complicated bereavement. He explained that the providers at Bethesda did not, however, conduct the type of neuropsychological testing and imaging that was conducted prior to trial due to the cost and duration of Combs' stay.

Dr. Fischer explained that psychiatrists and psychologists have different approaches to understanding and diagnosing mental illness. He testified that his

diagnoses of organic brain syndrome, a learning disability, and borderline personality disorder with antisocial traits were based in part on the criteria of the then-current Diagnostic and Statistical Manual of Mental Disorders, Third Edition, revised (1987) (DSM-III-r). He also explained that it was difficult to fit Combs into specific categories of the DSM-III-r because he manifested aspects of many different diagnoses. He opined that, without the constraints of the DSM-III-r, Combs was "brain damaged" and "schizophrenic." Dr. Fischer explained that his diagnosis was based on his assessment of Combs' entire life history in conjunction with neurological testing. Dr. Fischer acknowledged that the "different clinicians" used different terms for Combs' diagnoses, but he explained that this was "common" and that the experts "all found some sort of significant mental problems."

Similarly, Dr. Crinella acknowledged that Combs had received varying diagnoses since he was a teenager but testified he was "sure" that Combs had "show[n] disordered behavior for virtually all of his existence" and that he "continue[d] to show it today." He agreed that "behaviorally" Combs had a "combination of schizophrenia, borderline state," but "the only true diagnosis" he would give Combs was "organic brain syndrome."

Based on the testimony of these experts, the California Supreme Court could have reasonably concluded that Combs failed to present a prima facie case that trial counsel's strategic decision to present several experts to testify about Combs' background and mental disorders amounted to deficient performance under *Strickland*. *See Pinholster*, 563 U.S. at 195 (rejecting argument that counsel's duty of adequate representation required a particular course of mitigation). "Because we conclude that [counsel's]

performance was not deficient, we need not address whether [the petitioner] was prejudiced by any deficiency." *Demetrulias v. Davis*, 14 F.4th 898, 915 (9th Cir. 2021).

Although the experts testified about their differing diagnoses, they explained the reasons for those differences. Trial counsel was not required to seek out multiple experts to find one who provided the specific opinion Combs wanted. *McGill v. Shinn*, 16 F.4th 666, 686 (9th Cir. 2021) (noting that "[n]othing in the Sixth Amendment guarantees [a defendant] his choice of [experts], or an [expert] who will testify favorably to him" (citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985))); *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) (recognizing that an expert's failure to provide support for a mental impairment does not constitute ineffective assistance, and there is "no constitutional guarantee of effective assistance of experts").

### 2. Combs has not Shown Prejudice

Additionally, as the district court concluded, the California Supreme Court could have reasonably concluded that Combs failed to show that he was prejudiced by any deficiencies in counsel's preparation of the expert witnesses and their testimony of differing diagnoses at the penalty phase. *See Strickland*, 466 U.S. at 697 (outlining ineffective standard). When "the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence." *Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995) (determining that the petitioner was not prejudiced by counsel's failure to conduct an unlimited investigation into the possibility of brain damage when such an investigation would have led to a battle of the experts).

As set forth in Part IV.C.1, Combs contends that if counsel had conducted additional investigation of his biological family, counsel would have discovered evidence of a hereditary aspect to his bipolar disorder or fetal alcohol spectrum disorders. He argues that this evidence would have led to a reasonable probability of a different outcome in the penalty phase.

In a 2006 declaration, Combs' biological mother stated that she believed her pregnancy with Combs resulted from being raped by her father, that she drank quinine to try to force a miscarriage, and that she also used amphetamines, smoked a "nickel bag" of marijuana a week, and drank a "half rack (twelve cans)" of beer a week while pregnant. In her 2011 deposition, however, she denied drinking quinine when she was pregnant, characterized her weekly nickel bag of marijuana as "little bitty," and claimed that she drank a six-pack of beer every two weeks.

Much of the evidence that was developed for the state habeas corpus proceedings, including the opinions that Combs had fetal alcohol spectrum disorders, was based on his biological mother's 2006 declaration, which she later repudiated in her deposition. In his 2011 report, Dr. Richard Adler reported that drinking twelve beers a week while pregnant (the amount stated in the 2006 declaration) resulted in fetal alcohol spectrum disorders in 8% of a study group. He did not assess the prevalence of fetal alcohol spectrum disorders based on the consumption of a lesser amount. Dr. Novick Brown also relied on the report that Combs biological mother "drank twelve or more cans of beer per week" while pregnant.

Additionally, the experts for the habeas corpus proceedings made differing diagnoses based on Combs'

symptoms. For example, Dr. Adler diagnosed Combs with a cognitive disorder, reactive attachment disorder, and alcohol-related neurodevelopmental disorder. Drs. Weinraub and Khazanov made different diagnoses, including a "damaged central nervous system due to poor nutrition and dysfunctional relationships," "moderate organic brain damage," and "bipolar disorder."

Thus, there is nothing unusual or prejudicial about the penalty-phase experts labeling Combs' symptoms with different diagnoses. *See Pawlyk v. Wood*, 248 F.3d 815, 823 (9th Cir. 2001) (explaining that "[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness" (quoting *Ake*, 470 U.S. at 81)). And although the penalty experts offered different diagnoses, they all testified that Combs suffered from brain damage. Combs has not shown prejudice as a result of counsel's preparation of expert witnesses or as a result of their testimony. *Strickland*, 466 U.S. at 694; *see Bible v. Ryan*, 571 F.3d 860, 870–72 (9th Cir. 2009) (determining that trial counsel's failure to present evidence of possible brain damage was not ineffective when counsel had presented other mitigating evidence).

Moreover, the California Supreme Court could have reasonably concluded that additional testimony from the experts in the state habeas proceedings would have been outweighed by the strong evidence of Combs' financial motive for killing Lee, his pre-planning and selection of Lee as his victim, and his execution of his plan to kill Lee by using his martial arts training to restrain her and to ensure that he blocked her windpipe when he strangled her. *See Combs*, 101 P.3d at 1013–15; *see also Wong v. Belmontes*, 558 U.S. 15, 25 (2009) (per curiam) (holding that evidence of "emotional instability, impulsivity, and impairment of the

neurophysiological mechanisms for planning and reasoning" would have been countered by evidence of "the cold, calculated nature" of the murder committed by the defendant and his subsequent bragging about it (internal citation omitted)); *Schriro v. Landrigan*, 550 U.S. 465, 480–81 (2007) (affirming denial of claim of ineffective assistance of counsel in part because the proffered new evidence, including that petitioner's "cognitive and behavioral deficiencies [were] consistent with fetal alcohol syndrome," was weak compared to the aggravating circumstances).

Therefore, we conclude that the California Supreme Court could have reasonably determined that Combs failed to state a prima facie case that counsel was ineffective for failing to adequately inform and prepare the penalty-phase experts based on the significant amount of work counsel performed to present and frame the mental health evidence through those experts. *See Pinholster*, 563 U.S. at 188; *see also Clark*, 855 P.2d at 741–42, 749.

## E. Ineffective Assistance Based on Testimony that Combs had Been Diagnosed with Antisocial Personality Disorder

In his third subclaim, Combs contends that counsel provided ineffective assistance at the penalty phase by allowing defense experts to testify that he had been diagnosed with antisocial personality disorder. Combs contends that defense experts Dr. Graves and Dr. Fischer, and counselor Poor testified that he exhibited "sociopathic behavior," had "borderline personality [disorder] with some antisocial traits," and diagnosed him with antisocial personality disorder. He argues that this diagnosis of "antisocial personality disorder" was incorrect and that counsel was ineffective for failing to elicit from the defense

experts that "Combs's brain damage negated the antisocial personality disorder diagnosis." He further argues that an antisocial personality disorder diagnosis has negative connotations, and that competent counsel would have avoided introducing this "harmful testimony to the factfinder." *See Pawlyk*, 248 F.3d at 823.

The decision of which witnesses to present is a strategic one. *See United States v. Harden*, 846 F.2d 1229, 1232 (9th Cir. 1988). Here, both attorneys who defended Combs at trial are deceased; thus, the record does not include their reasons for presenting certain testimony at the penalty hearing. The California Supreme Court, however, could have reasonably concluded that counsel had reasonable strategic reasons for presenting the testimony from the medical experts and counselor Poor despite knowing that some of their testimony could reveal information that was unfavorable to Combs. *See Davis v. Woodford*, 384 F.3d 628, 648–49, 656 (9th Cir. 2004) (concluding that "[c]ounsel exercised appropriate professional judgment in choosing to put [the expert] on the stand despite the prospect that he might" testify that the petitioner had antisocial personality disorder when the expert also provided mitigating testimony).

Combs' medical records included evidence that he was suspected of having antisocial personality disorder, and thus, defense counsel could not avoid the issue. The defense experts addressed these records during their testimony and explained why they rejected the antisocial personality disorder diagnosis. For example, counselor Poor noted that some Halcyon staff members thought Combs exhibited signs of antisocial personality disorder, but he was not formally diagnosed because the staff members were not unanimous.

Defense expert Dr. Graves noted that Combs showed some signs of antisocial behavior, but he did not diagnose that disorder. On cross-examination, Dr. Graves acknowledged that Combs met some DSM-III-r criteria for antisocial personality disorder, but he explained that he rejected the diagnosis because Combs expressed remorse and because if his actions occurred during a manic episode, that would exclude antisocial personality disorder. Thus, although Dr. Graves testified that Combs met some criteria of antisocial personality disorder, his testimony was mitigating because he opined that Combs' traits were more consistent with manic-depressive illness.

On cross-examination, Dr. Crinella acknowledged that two examining doctors had opined that Combs had antisocial or sociopathic personality disorder and stated that this disorder was consistent with Combs' history. He agreed with Dr. Oshrin that schizophrenia, depression, and bipolar disorder may have genetic components. Dr. Crinella explained, however, that Combs was "diagnostically confusing," and he concluded that Combs primarily exhibited signs of organic brain syndrome, which caused Combs to act differently from others throughout his life. He explained that people with organic brain syndrome are many times more predisposed to criminal behavior than those without it.

Dr. Fischer testified that Combs exhibited signs of mania and bipolar disorder, psychosis, and some antisocial personality disorder traits. Although such testimony presents "obvious countervailing tactical dangers for [the defendant]," *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (quoting *State v. Gerlaugh*, 698 P.2d 694, 704 (Ariz. 1985)), on the whole, his testimony benefited Combs' defense by demonstrating that Combs "was not entirely a

creature of his own making," *Davis*, 384 F.3d at 648. Dr. Fischer conducted a battery of neuropsychological tests on Combs and discussed those results. He concluded that Combs suffered from organic brain dysfunction and a learning disability. Dr. Fischer also found that Combs had schizophrenia with manic features. Dr. Fischer opined that Combs' drug use influenced his behavior. When an expert provides helpful mitigating evidence, "that he also provided some damaging testimony does not mean that the decision to use him as a witness fell below an objective standard of reasonableness." *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004).

Because Combs sought to benefit from mitigating testimony about his mental impairments, the prosecution was permitted to introduce evidence that his medical records included diagnoses of antisocial personality disorder or conclusions that he had traits of that disorder. *See Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987) (observing that when a defendant requests a psychiatric evaluation or presents psychiatric evidence, the prosecution may rebut it "with evidence from the reports that the defendant requested"). As the district court determined, the California Supreme Court reasonably concluded on direct appeal that the prosecution could have discovered the mental health professionals' reports and called them as witnesses. *See id.* Thus, defense counsel reasonably sought to present evidence of the antisocial personality disorder diagnosis in a more favorable light by presenting experts who explained that the diagnosis was precluded by, or at least secondary to, Combs' organic brain syndrome. Trial counsel could have reasonably determined that the benefit of Dr. Fischer's testimony outweighed any harm resulting from his

acknowledgement that Combs had some antisocial personality disorder traits. *See Davis*, 384 F.3d at 648.

Thus, the California Supreme Court could have reasonably determined that Combs failed to establish a prima facie case for relief that counsel was deficient for presenting testimony from Dr. Fischer and the other defense experts. The defense experts either rejected the antisocial personality disorder diagnosis or qualified it with mitigating explanations. Additionally, the California Supreme Court could have reasonably concluded that Combs failed to show that, but for counsel's failure to try to avoid the antisocial personality disorder diagnosis, there is reasonable probability that the outcome would have been different. *See id.*

## F. Ineffective Assistance Based on Failure to Rebut Argument that Combs Lacked Remorse

In his fourth subclaim, Combs argues that counsel was ineffective at the penalty phase for failing to rebut the prosecutor's argument that Combs lacked remorse. Combs argues that if counsel had conducted a reasonable investigation of his biological family, they could have presented expert testimony that Combs' lack of remorse was a symptom of his mental impairments, including "[fetal alcohol spectrum disorders] which caused brain damage." Counsel has a duty to investigate mitigating evidence and to be prepared to rebut aggravating evidence. *Wiggins*, 539 U.S. at 522, 524. As previously discussed, the California Supreme Court could have reasonably determined that Combs failed to demonstrate that counsel performed deficiently in investigating his biological family.

In the alternative, the California Supreme Court could have reasonably determined the Combs failed to

demonstrate prejudice. Combs points to declarations from trial jurors submitted during state habeas proceedings in 2006 that suggest that Combs' lack of remorse contributed to their decision to impose the death penalty. He then argues that he was prejudiced by counsel's failure to explain the reasons for his flat affect. But the prosecution did not argue that Combs' demeanor showed a lack of remorse; rather, it argued that Combs' statements in response to questioning from detectives showed a lack of remorse. For example, the prosecution noted that Combs suggested that a human life was worth $5,000 to $10,000.

Further, although some of the juror declarations identified Combs' flat affect at trial and his lack of remorse as reasons for the death verdict, these statements were inadmissible under California and federal law. *See* Cal. Evid. Code § 1150 (prohibiting the admission of evidence regarding the effects of any statement, conduct, condition, or event upon a juror "in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined"); Fed. R. Evid. 606(b)(1) (prohibiting juror testimony regarding any statements made or incidents occurring during deliberations, the effect of anything on the juror's votes, or any juror's mental processes concerning the verdict). The California Supreme Court could have reasonably declined to consider the juror declarations.

Because the prosecution did not focus on any aspects of Combs' trial demeanor, and because evidence about its importance to the jurors was inadmissible, the California Supreme Court could have reasonably concluded that Combs failed to demonstrate a prima facie case of relief based on ineffective assistance at either the deficient performance or prejudice prong of the *Strickland* analysis.

*Strickland*, 466 U.S. at 687. *See Pinholster*, 563 U.S. at 188 n.12; *see also Clark*, 855 P.2d at 741–42, 749.

## G.  Ineffective Assistance Based on Failure to Present Evidence that Combs was a Follower

In his fifth subclaim, Combs contends that counsel was ineffective for failing to present evidence that he was a follower and for failing to rebut the prosecution's contention that he orchestrated Lee's murder.  Contrary to Combs' contention, the record reflects that trial counsel presented such evidence.  Dr. Oshrin's report, which was admitted as evidence, included Combs' statement that it was Purcell's idea to kill Lee and that she "influenced" him to participate in the murder.  At the penalty phase, Combs' aunt, uncle, sister, and former teachers testified that Combs was always a follower, not a leader, when he was growing up.  His aunt testified that Combs' adoptive mother worried because Combs was easily persuaded by other children to do things that would get him in trouble.  Thus, counsel presented evidence that Combs was a follower.

Moreover, even if Combs had presented a prima facie case of counsel's deficient performance on this basis, the California Supreme Court could have reasonably determined that Combs did not make a prima facie showing of prejudice.  There was significant evidence that Combs took a lead role in planning and executing Lee's murder.  Combs admitted that he killed Lee for money.  The initial intended victim was his friend Dan Smith, but because Combs could not persuade Smith to give him a ride, he substituted Lee as his victim and tricked her into driving him and Purcell into the desert alone. Other witnesses and physical evidence corroborated Combs' statements and admissions that he selected an electrical cord as a strangulation tool, used it to strangle Lee from a position

of surprise based on his martial arts training, instructed Purcell to bind Lee's hands so she could not grab the cord, and directed Purcell to hit Lee in the head with rocks and a flashlight. *See also Combs*, 101 P.3d at 1027–28 (determining on direct appeal that the evidence of Combs' "motive and planning was overwhelming").

In sum, the California Supreme Court could have reasonably determined that Combs failed to make a prima facia case for relief of both deficient performance and prejudice. *Strickland*, 466 U.S. at 687. *See Pinholster*, 563 U.S. at 188 n.12; *see also Clark*, 855 P.2d at 741–42, 749.

## H. Ineffective Assistance Based on Failure to Present a Substance Abuse Expert

In his sixth subclaim, Combs argues that trial counsel was ineffective for failing to present a substance abuse expert at the penalty phase to testify about Combs' addiction and to explain how drugs impacted Combs' thought processes. To support this claim, Combs relies on a declaration from psychiatrist Clark Smith, which discusses declarations from lay and expert witnesses asserting that Combs regularly used and was addicted to amphetamines at the time he killed Lee. Combs also relies on a declaration from a "*Strickland* expert," attorney Peter Scalisi, submitted in the 2006 state habeas proceedings, stating that the failure to call an addiction expert and provide the expert with evidence of Combs' biological background was ineffective assistance.

Although Combs submitted Scalisi's opinion that trial counsel was ineffective, "expert testimony of outside attorneys" is not necessary to determine the appropriate standard of care. *Hovey v. Ayers*, 458 F.3d 892, 910–11 (9th Cir. 2006) (quoting *LaGrand v. Stewart*, 133 F.3d 1253,

1270 n.8 (9th Cir. 1998)).  And when a defendant presents a *Strickland* expert, the court is not required to accept the expert's opinion and may instead reach its own conclusion on whether counsel was ineffective.  *See id.* (concluding that the district court did not abuse its discretion by excluding experts on the defendant's ineffective assistance of counsel claims); *see also Miller v. Francis*, 269 F.3d 609, 620 (6th Cir. 2001) (recognizing that an appellate court was not bound by the opinion of a legal defense expert on the question of ineffective assistance of counsel).  Accordingly, the California Supreme Court could have reasonably determined that it was not bound by Scalisi's opinion and reached a different conclusion.

Combs further argues that counsel did not locate his biological mother before trial and thus failed to discover and present evidence that he was "genetically pre-disposed to drug addiction," that his "pre-existing brain damage from his [fetal alcohol spectrum disorders]" increased the likelihood that addiction would impair his brain functioning, and that his drug use made him susceptible to manipulation.  To the extent that this claim is based on counsel's alleged failure to investigate Combs' biological family, the California Supreme Court could have reasonably concluded that Combs failed to state a prima facie claim for relief based on counsel's deficient performance in their investigation.  *See supra* Part IV.C.

Moreover, counsel presented substance abuse evidence, and counsel's strategic decisions regarding witness testimony on that issue are entitled to deference.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1252–53 (9th Cir. 2011) (rejecting claim that trial counsel was ineffective for failing to present evidence of the defendant's abusive childhood and substance abuse when counsel presented that evidence

through the testimony of several witnesses); *see also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (concluding that counsel's failure to consult with several experts identified in the petitioner's brief was not unreasonable when counsel "did retain medical experts whom he thought well-qualified").  Specifically, trial counsel presented expert testimony about Combs' amphetamine use at the time of Lee's killing, how it aggravated his cognitive and mental impairments, and how it influenced his behavior.  For example, Dr. Graves testified that Combs used amphetamines before the killing and that Combs' statement that he experienced "a rush" when he strangled Lee and his apparent lack of effort to hide the body or the murder weapons indicated that, when Combs killed Lee, he was "intoxicated with amphetamines . . . that aggravated his manic-depressive illness."  Dr. Fischer testified similarly that Combs met the criteria for "amphetamine intoxication and amphetamine dependence," which, along with his "organic brain problem," affected his personality.  In closing arguments, counsel relied on this testimony to argue that killing Lee was "aberrative behavior" that resulted from Combs' mental illness and was exacerbated by his amphetamine abuse.

Combs does not argue that any of the defense's experts recommended that the defense hire a substance abuse specialist.  *See Babbitt*, 151 F.3d at 1174 (concluding that counsel was not obligated to seek additional experts when none of the retained experts stated "that they required the services of [] additional experts"); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1038–39 (9th Cir. 1995) (noting that the Constitution does not "require an attorney, without interdisciplinary guidance, to provide a psychiatric expert with all information necessary to reach a mental health

diagnosis"). Further, Combs has not identified a substance abuse specialist, described the testimony the proffered expert would have given, or demonstrated that such an expert was available and would have testified favorably at trial. *Alcala v. Woodford*, 334 F.3d 862, 872 n.3 (9th Cir. 2003) (citing cases denying claims of ineffective assistance when the petitioner failed to make these showings). Combs' speculation about how an expert "could have" testified is insufficient to carry his burden. *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997).

Therefore, the California Supreme Court could have reasonably determined that Combs failed to state a prima facie case that trial counsel was deficient for failing to obtain a substance abuse specialist. *See Fairbank*, 650 F.3d at 1253, 1257 (concluding that the state court reasonably determined that, when counsel presented expert testimony addressing the general impact of drug use and drug psychosis, counsel was not deficient for failing to present additional experts linking those impacts to the defendant).

Furthermore, the record does not demonstrate that, but for counsel's failure to present evidence that Combs was addicted to amphetamine around the time of the murder, there is a reasonable probability that the jury would have returned a life sentence. The prosecution could have impeached any expert testimony regarding addiction with Combs' statements. *See In re Ross*, 892 P.2d at 1300. For example, Combs reported that he was never "hooked" on amphetamines and that he only used amphetamines "twice a year." Additionally, Combs told detectives that he was sober when he planned the robbery and murder, including when he chose Lee as the victim, and that he did not use amphetamines until about four hours before he called Lee on the day of the murder.

Considering the aggravating facts of the robbery and murder, the expert testimony the defense presented about the impact of Combs' amphetamine use at the time of the murder, Combs' statements about his drug use, and that the presentation of an additional expert on the subjects of drug abuse and addiction would not have had a reasonable probability of resulting in a different sentence, the California Supreme Court could have reasonably concluded that counsel was not deficient for failing to obtain a substance abuse expert. *See Pinholster*, 563 U.S. at 201 (holding that a reviewing court should consider the possibility that proposed new mitigation evidence could have led to rebuttal from the prosecution, especially when evidence of substance abuse is "by no means clearly mitigating"); *see also Miles*, 713 F.3d at 490 (determining that a substance abuse expert's proposed testimony would have been "of limited value" considering, among other things, the defendant's "acknowledgment that he was not under the influence of drugs or alcohol at the time of the offense").[5]

## I.  Ineffective Assistance Based on Disseminating Court-Appointed Expert's Report

In his seventh subclaim, Combs argues that trial counsel was ineffective for providing Dr. Oshrin's report to defense

---

[5] Combs' citation to *Jackson v. Calderon*, 211 F.3d 1148 (9th Cir. 2000), is unavailing.  There, we concluded that counsel's failure to present expert testimony on the effect of the defendant's drug use on his mental health was prejudicial.  *Id.* at 1163.  *Jackson*, however, was not decided under § 2254(d)'s deferential standard, *id*. at 1153, and there, counsel's "total investigation for purposes of the penalty phase took less than two hours," and counsel did not present any medical testimony or evidence, *id.* at 1161–63 (noting that the mitigation case "consisted of the testimony of Jackson's wife and his mother").  Here, in contrast, counsel thoroughly prepared for the penalty phase.

experts and the prosecution and thus opening the door to harmful rebuttal testimony. About a month after Lee's murder, the trial court appointed Dr. Oshrin under California Evidence Code sections 730, 952, and 1017. He interviewed Combs and prepared a report that included his diagnosis of antisocial personality disorder and explained that "some antisocial behavior is predisposed through genetic means." Dr. Oshrin also concluded that Combs was competent to stand trial and was not legally insane when he planned and committed Lee's murder. He noted that Combs might have been under the influence of amphetamines at the time of the murder, but he believed Combs "knew the difference between right and wrong," that he was able to, and did, form the specific intent to kill, and that he had "the mental capacity to harbor malice." Combs argues that counsel unreasonably provided Dr. Oshrin's report to defense experts Drs. Fischer and Crinella, who relied on that report in their conclusions and testimony, and that counsel also unreasonably provided the report to the prosecutor.

During his guilt-phase testimony, Dr. Crinella testified that his conclusions about Combs' mental state were based, in part, on Dr. Oshrin's report. Defense counsel disclosed Dr. Oshrin's report to the prosecutor during the recess between Dr. Crinella's direct and cross examinations. *Combs*, 101 P.3d at 1035. At the penalty phase, Drs. Crinella and Fischer testified that they had reviewed Dr. Oshrin's report and relied on portions of it in reaching their conclusions about Combs. Defense counsel did not object when the prosecutor used the report to cross-examine Drs. Crinella and Fischer.

Combs argues that counsel's actions allowed the jury to hear incriminating statements that he made to Dr. Oshrin and to learn that Dr. Oshrin had diagnosed Combs with antisocial

personality disorder.   Thus, Combs' arguments challenge counsel's strategic decision to provide Dr. Oshrin's report to the defense experts.   *Strickland*, 466 U.S. at 689.   A reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time" of that conduct.  *Id.* at 690.

Defense experts Drs. Crinella and Fischer considered Dr. Oshrin's report in forming their opinions about Combs, and therefore providing them with Dr. Oshrin's report benefitted the defense.[6]   Moreover, once counsel made the strategic decision to put Combs' mental state at issue, it was sound strategy to disclose Dr. Oshrin's report to Drs. Crinella and Fischer because not doing so would have "compelled [them] to testify that [they] did not receive all the reports," which, in turn, could have provided grounds for impeachment and still led to the disclosure of the report.   *McDowell v. Calderon*, 107 F.3d 1351, 1361 (9th Cir. 1997), *vacated on other grounds on reh'g en banc*, 130 F.3d 833, 835 (9th Cir. 1997).   Thus, the California Supreme Court could have reasonably determined that Combs failed to show that counsel's performance was deficient.

Alternatively, the California Supreme Court could have reasonably denied this claim at *Strickland*'s prejudice prong because disclosing Dr. Oshrin's report was unavoidable. "[W]hen a defendant places his mental status at issue and presents favorable evidence from a psychiatric evaluation, he waives confidentiality as to evaluations unfavorable to his defense."   *Pawlyk*, 248 F.3d at 828; *see also Kansas v. Cheever*, 571 U.S. 87, 94 (2013) (stating that "[w]hen a

---

[6] Combs cited Dr. Oshrin's report in support of some of his claims in his state habeas petition, and in his opening brief in this court, which supports the conclusion that the report was beneficial to the defense.

defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted" to rebut that evidence with "testimony from an expert who has also examined him"). And disclosing an unfavorable psychological evaluation does not violate a defendant's Sixth Amendment right to counsel. *Buchanan*, 483 U.S. at 424–25; *see also Pawlyk*, 248 F.3d at 825 ("*Buchanan* and *Estelle* [*v. Smith*, 451 U.S. 454 (1981),] establish that the Sixth Amendment is not violated by the introduction of evidence regarding a psychiatrist's evaluation requested by the defendant.").

Additionally, withholding Dr. Oshrin's report would not have prevented the jury from learning of Combs' antisocial personality disorder diagnosis because other medical providers reached the same conclusions as Dr. Oshrin. For example, like Dr. Oshrin, the defense experts concluded that Combs was not suffering hallucinations or delusions and that his history was consistent with "the diagnosis of the elements" of antisocial personality disorder. The defense experts also disclosed Combs' statements about his motives for the murder, including getting "[m]oney and a car to get out of town," and his statement that committing the crime was the "ultimate rush." Combs made the same statements to the detectives, and the recording of these statements was played for the jury.

Therefore, the California Supreme Court could have reasonably determined that Combs failed to present a prima facie claim of ineffective assistance of counsel based on counsel's failure to prevent the disclosure of Dr. Oshrin's

report.[7] *See Pinholster*, 563 U.S. at 188 n.12; *see also Clark*, 855 P.2d at 741–42, 749.

## J. Ineffective Assistance Based on Failure to Properly Respond to Juror Questions

In his eighth subclaim, Combs argues that trial counsel was ineffective for failing to adequately respond to jurors' questions. Combs argues that the jurors' questions suggest that counsel's presentation in mitigation was inadequate. As the district court concluded, this argument is speculative. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam). The trial court permitted jurors to submit questions, which the court discussed with counsel outside of the jury's presence to determine whether, and how, to respond to the questions, and whether counsel would ask a witness the question. The court told jurors that their questions "may or may not" be answered.

During the penalty phase, the trial court received numerous questions from jurors, including the alternates. In his opening brief, Combs focuses on ten juror questions related to the "mental health evidence," including questions from two alternates who did not participate in deliberations. Combs asserts that because his "mental deficits were the primary mitigating evidence," counsel's failure to respond to the jurors' questions or to clarify the confusion expressed in those questions was ineffective.

---

[7] In a footnote, Combs asserts that the trial court violated state and federal law by allowing the prosecutor to call Dr. Oshrin as a witness. The district court rejected this claim, which is not certified nor presented as an uncertified claim. Accordingly, this claim is not properly raised on appeal, and we decline to consider it. *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1(e).

The record reflects, however, that for the questions posed by jurors who deliberated, trial counsel either addressed the subject matter raised in the jurors' questions or had a strategic reason for not doing so.  For example, during Dr. Graves' testimony, a juror asked if Dr. Graves agreed with Dr. Crinella's assessment that Combs was "manipulative," knew "right from wrong," and that his MRI results were inconclusive.  After receiving these questions, defense counsel questioned Dr. Graves about the difference between legal insanity and mental illness.  Counsel also elicited testimony from Dr. Graves and Dr. Fischer that Combs' MRI results conclusively showed brain damage.

The same juror also asked whether Combs could "fake" the testing.  Dr. Graves' testimony addressed this question. Dr. Graves' testimony had already refuted the assessments from Halcyon Center providers, which described Combs as manipulative and a malingerer.  He also testified that even if an individual could fake some tests, they would likely be caught, and he noted that the test results in Combs' case were "consistent with his history."  Dr. Crinella similarly testified that it was extremely unlikely that Combs could fake a battery of tests over a period of years, and he noted that Combs showed similar patterns on numerous tests and evaluations over the course of fifteen to twenty years.  This juror also asked whether Combs could fake the EEG results, and Dr. Crinella opined that Combs could not fake the results of an MRI or EEG.

During the prosecution's redirect examination of Dr. Oshrin, a different juror asked, "[i]f Mr. Combs is mentally ill," could he have faked "being normal" during his interview with Dr. Oshrin.  Defense counsel did not present this question to Dr. Oshrin.  But Dr. Oshrin indirectly addressed this question by stating that he could diagnose someone after

talking with them based on his years of experience, and he testified that Combs did not have any kind of mental disorder that would absolve him of responsibility or prevent him from standing trial. This juror also asked whether Combs was currently taking medication to control his manic depression. Dr. Graves addressed this question on cross-examination when he discussed Combs' medication records and his self-reported use of methamphetamine. Finally, this juror asked whether Combs' mental disorders meant he was psychotic. On cross-examination, Dr. Fischer clarified Combs could not be classified as psychotic.

Combs also contends that counsel failed to address questions regarding whether psychotropic medication controlled or affected Combs' mental illness. Another juror expressed concern about testimony regarding Combs' "uprising" over "not wanting to go to court," and asked if Combs was violent when he was detained between November 1990 and June 1992 and, if so, whether his behavior was controlled with medications. When the court asked if counsel wanted to respond to this question, counsel replied that this was a factual issue for the jury to resolve. But counsel also presented testimony from Drs. Graves and Fischer about Combs' medications and behavior in jail. Nurse Hunt and Dr. Oshrin also testified about Combs' medication, including that he was not "on any medication" when Dr. Oshrin interviewed him in 1990. Counsel could have reasonably decided against presenting this juror's question about Combs' violent acts because it would have highlighted that aggravating evidence.

Thus, the record reflects that the issues raised in the jurors' proposed questions were either addressed in witness testimony or counsel made a reasonable strategic decision not to pose the questions to the experts or revisit a topic that

had already been addressed.  *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) (holding that "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect").

Additionally, most of the questions that Combs identifies in his brief were asked by two alternate jurors.  The trial court did not disclose the juror's questions to the entire jury, the alternate jurors did not participate in deliberations, and the jury was instructed that it was not to discuss the evidence during the trial.  We presume the jury understood and followed this instruction.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Under these circumstances, the California Supreme Court could have concluded that Combs failed to make a prima facie case for relief based on ineffective assistance of counsel in responding to the jurors' questions.  Combs has not shown that there was no reasonable basis for the state court's decision.

## K. Ineffective Assistance Based on Failure to Request a Limiting Instruction on Victim Impact Testimony

In his ninth subclaim, Combs argues that counsel was ineffective for failing to request an instruction to limit the jury's consideration of victim impact testimony at the penalty phase.  But Combs has not identified any victim impact testimony that was introduced in the penalty phase, and the record reflects that there was none.  During the penalty phase, the prosecution's evidence of aggravation consisted of the circumstances of the crime, which had been presented during the guilt phase, and Combs' prior criminal acts of violence, including robberies he committed as a

juvenile, his violent acts while in jail, and his four prior felony convictions.

Although Lee's father and sister testified during the guilt phase about the circumstances of Lee's death, they did not testify about the impact of her death.  Lee's father testified about the phone call he received from an individual asking for Lee, another phone call about the attempt to cash her checks, and Lee's activities before she left with Combs.  He also identified Lee's checkbook and car.  Lee's sister identified Lee from a photograph, testified that she also had two brothers, and confirmed her father's identity.  Because there was no victim impact testimony, there was no basis for counsel to request a limiting jury instruction and thus no deficiency in failing to do so.  *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (stating that "the failure to take a futile action can never be deficient performance").

Accordingly, the California Supreme Court could have reasonably determined that Combs failed to support a prima facie claim of ineffective assistance of counsel regarding this subclaim.

## L.  Ineffective Assistance Based on Failure to Object to Suggestion that Combs would be Thrilled to Receive a Life Sentence

In his tenth subclaim, Combs argues that the prosecutor engaged in misconduct by asking Dr. Fischer on cross-examination whether Combs would be "thrilled" to receive a sentence of life in prison, and that counsel was ineffective for failing to object to the question or to reframe it on redirect.  He contends that this testimony "created the impermissible risk that the jury was skewed in favor of a death sentence."

Near the conclusion of his direct testimony at the penalty phase, defense expert Dr. Fischer testified that Combs could "get[] along in an institutional setting," and lead a "satisfactory" life in prison based on his need for "structure." On cross-examination, when asked if Combs would be "thrilled to be in prison," as opposed to being sentenced to death, Dr. Fischer responded that he had not heard Combs express a wish to die.  The prosecutor also asked if Dr. Fischer meant that Combs "would be just happy-go-lucky in prison; that's his type of life?"  Fischer responded, "No," and clarified that Combs was "capable of getting along" in a "highly-structured institutional environment" but incapable of "getting along outside."  The prosecutor did not revisit this line of questioning and did not refer to it in closing arguments.

To support this argument, Combs cites *Zapata v. Vasquez*, 788 F.3d 1106, 1116 (9th Cir. 2015), but that case is distinguishable.  In *Zapata*, counsel failed to object to the prosecutor's closing argument, which speculatively attributed racial slurs and coarse language to the defendant and which the California Court of Appeal deemed misconduct.  *Id*. at 1113–16.  Here, in contrast, the prosecutor's cross-examination appropriately addressed an issue raised during Dr. Fischer's direct examination. *People v. Morris*, 807 P.2d 949, 989 (Cal. 1991) (explaining that a defendant can open the door to otherwise prohibited subjects).  The prosecutor did not commit misconduct under these circumstances.  It was not inappropriate or prejudicial to suggest that Combs would prefer a sentence of life in prison without parole because "death is the worse punishment." *People v. Memro*, 905 P.2d 1305, 1357 (Cal. 1995).  Further, Dr. Fischer did not agree with the prosecutor's suggestion but instead explained that Combs

needed a structured environment and that prison was the "sort of environment where [Combs] is capable of getting along." *See People v. Boyette*, 58 P.3d 391, 434 (Cal. 2002) (finding "no prejudice because the witness did not agree with the implied premise of the prosecutor's line of questioning").

Defense counsel could have reasonably determined that continuing to pursue this issue would not benefit the defense. *See Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) ("[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must . . . meet only objectively reasonable standards."). Additionally, during closing argument, defense counsel addressed Dr. Fischer's testimony by stating that "the only time [Combs is] out of trouble is when he's in jail" and that he could not "function in society." Counsel also emphasized the severity of a sentence of life without the possibility of parole "in a maximum security prison." Thus, to the extent that the prosecutor suggested that Combs would enjoy spending his life in prison, defense counsel made a reasonable strategic decision about how to address this issue. *See id.* Moreover, the trial court repeatedly instructed the jurors that "[s]tatements made by the attorneys during the trial are not evidence," they should not "assume to be true any insinuation suggested by a question asked a witness," that "[a] question is not evidence and may be considered only as it enables [the juror] to understand the answer," and that "[e]vidence consists of testimony of witnesses." The prosecution reiterated these instructions during closing arguments. We presume the jurors understood and followed the trial court's instructions. *See Weeks*, 528 U.S. at 234.

Accordingly, the California Supreme Court could have reasonably determined that Combs failed to present a prima

facie case of either deficient performance or prejudice regarding this claim, and thus the district court properly denied relief.

## M. Ineffective Assistance Based on Failure to Rebut Aggravating Evidence of Prior Convictions

In his eleventh subclaim, Combs argues that because counsel inadequately investigated his biological family history, counsel also failed to discover and present evidence of Combs' history of mental and cognitive impairments, including fetal alcohol syndrome disorders, to rebut the prosecution's aggravating evidence of his prior convictions. To the extent this subclaim is based on counsel's alleged deficient investigation to identify Combs' biological mother, it fails for the reasons previously discussed in Part IV.C.

Additionally, this subclaim lacks merit for other reasons. To establish aggravating circumstances at the guilt phase, the prosecution presented evidence of Combs' juvenile adjudications for robbery and his four adult felony convictions. Before the penalty phase, defense counsel moved to exclude evidence of Combs' unadjudicated criminal conduct, prior felony convictions, and his violent conduct while in jail. Counsel argued that Combs did not knowingly, voluntarily, and intelligently waive his constitutional rights before entering his pleas that resulted in his prior convictions. The trial court denied Combs' motion.

On appeal, Combs asserts that counsel was ineffective for failing to argue that Combs was denied effective assistance of counsel at the time of his prior guilty pleas because previous counsel allowed him to plead guilty despite his mental impairments. On habeas review, we consider the "reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct." *Strickland*, 466 U.S. at 690. Applying this standard, the California Supreme Court could have reasonably determined that Combs failed to demonstrate that counsel was deficient. *See Pinsholster*, 563 U.S. at 187–88.

Combs suggests, without support, that his mental impairments made him incompetent to waive his constitutional rights and enter a guilty plea. The standard for competence to waive constitutional rights is the same as the standard for competence to stand trial. *Godinez v. Moran*, 509 U.S. 389, 391, 398–99 (1993). Combs points to no record evidence indicating that he was incompetent at the time of his prior convictions. For example, the psychiatrist who conducted the court-ordered examinations in 1985 and 1986 found Combs "legally competent to proceed" despite his various mental disorders. Additionally, none of the experts who were consulted prior to Combs' trial indicated that he was incapable of understanding his rights and entering a plea. Shortly after his arrest in 1990, Dr. Oshrin evaluated Combs and found him competent. In 1992, court-appointed psychologist Dr. Malancharuvil found that Combs understood the "nature and seriousness of the charges leveled against him" and the "pleas he [could] make," and Dr. Kania found that he was capable of cooperating with counsel. Combs' "attorneys were entitled to rely on these reports," which indicated that Combs was capable of understanding and entering a plea. *Moran v. Godinez*, 57 F.3d 690, 700 (9th Cir. 1995), *superseded on other grounds as described in*, *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008).

Moreover, while Combs' experts for his habeas corpus proceedings opined that, at the time of Combs' prior convictions, Combs suffered severe mental impairments, they did not opine that he was incompetent when he entered

his guilty pleas. Additionally, the opinions on Combs' mental state at the time of his guilty pleas are accorded little weight because they were not based on contemporaneous medical records. *See Boyde v. Brown*, 404 F.3d 1159, 1166–67 & n.7 (9th Cir. 2005); *see also Williams v. Woodford*, 384 F.3d 567, 609–10 (9th Cir. 2004) (affording little weight to competency assessments of habeas experts in part because "the passage of time and the difficulties inherent in evaluating the defendant's competence from a written record reduce the likelihood of an accurate retrospective determination"). Thus, counsel could have reasonably determined that a motion to exclude the evidence of Comb's prior convictions on the ground that he was incompetent to enter guilty pleas was futile. *See James*, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.").

Therefore, the California Supreme Court could have reasonably determined that Combs failed to present a prima facie case for either deficient performance or prejudice regarding this claim, and the district court properly denied relief.

### N. Ineffective Assistance Based on Failure to Present Mitigating Evidence

In his twelfth subclaim, Combs also argues that counsel was ineffective for failing to "present mitigating evidence to the jury that Combs had been molested by his older sister Letitia for over three years despite being aware of this information." Combs cites Halcyon Center treatment records that describe Combs telling counselor Poor that his older adoptive sister had sexually abused him from ages 13 to 16. These records were admitted into evidence, and during the penalty phase, Poor testified that Combs reported

being sexually abused by his older sister. Because counsel *did* present evidence that Combs was abused by his sister, the California Supreme Court could have reasonably determined that Combs failed to present a prima facie case for relief on this claim based on deficient performance.

## O. Cumulative Error

Combs next argues that the California Supreme Court unreasonably denied his claim that counsel's multiple alleged unprofessional errors were cumulatively prejudicial under the Sixth Amendment. In *Bemore v. Chappell*, we considered counsel's multiple unprofessional errors cumulatively under *Strickland*'s prejudice prong to determine whether the petitioner was denied his Sixth Amendment right to the effective assistance of counsel. 788 F.3d 1151, 1176 (9th Cir. 2015) (explaining that two ineffective representation decisions "must be viewed cumulatively in determining whether the *Strickland* prejudice standard was met with regard to the jury's decision to sentence Bemore to death").

Combs argues that "all prior counsel was [sic] ineffective for previously failing to raise the bases for relief alleged in this claim." To the extent this claim refers to appellate counsel, it is not properly before us because it is not a certified claim, and Combs does not identify it as an uncertified issue. Fed. R. App. P. 22(b); 9th Cir. R. 22-1(e). To the extent Combs argues that he was prejudiced by the cumulative effect of state habeas counsel's deficient performance, his claim fails because "the ineffectiveness or incompetence of counsel during . . . State collateral post-conviction proceedings shall not be a ground for relief." 28 U.S.C. § 2254(i).

Combs also argues that he was prejudiced by the cumulative effect of trial counsel's deficient performance during the penalty phase. The California Supreme Court could reasonably have concluded that the alleged deficient performance during the penalty phase, considered cumulatively, did not prejudice Combs because his individual subclaims of deficient performance failed. *See McGill*, 16 F.4th at 684 ("A court 'cannot consider the cumulative effect of *non*-errors.'" (quoting *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018))). The cases Combs cites, which were not decided under AEDPA and § 2254(d)'s deferential standard, do not support a contrary conclusion. Additionally, they are distinguishable because, unlike counsel in this case, counsel either conducted no investigation or failed to present available mitigating evidence. *See Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1435–36 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 617 (9th Cir. 1992) (per curiam). Accordingly, the California Supreme Court could have reasonably determined that Combs failed to present a prima facie case of cumulative prejudice.

Finally, we reject Combs' argument that the California Supreme Court and the district court erred by failing to hold evidentiary hearings on his penalty-phase claims of ineffective assistance of counsel because the record was sufficient to resolve Combs' claims. *See Hibbler*, 693 F.3d at 1147 ("A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question."); *Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) (holding that "once the district court has determined that § 2254(d) precludes habeas relief," the

denial of an evidentiary hearing is not an abuse of discretion).

## V. Uncertified Claims

Combs presents two uncertified claims. In the first, he asserts several subclaims based on his competence, including that his procedural and substantive due process rights were violated because he was incompetent, the trial court failed to order a second competency hearing sua sponte, and trial counsel was ineffective for failing to request additional competency hearings. In the second, he asserts that his Sixth Amendment rights were violated by juror bias. Before addressing these claims, we discuss the relevant legal standards and background.

Under AEDPA, a petitioner seeking a certificate of appealability "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; *or* that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (alteration in original) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). As we explain next, because Combs has not made the required showing, we deny a certificate of appealability for Combs' substantive and procedural due process competency claims, his subclaim alleging ineffective assistance based on counsel's failure to request a second competency hearing during the guilt phase of trial, and his claim of juror bias. *See* 28 U.S.C. § 2253(c)(1)(A), (2); *Lambright*, 220 F.3d at 1025.

While we grant a certificate of appealability on Combs' subclaim that counsel was ineffective for failing to request a second competency hearing at the penalty phase, we affirm the district court's denial of that claim. *See Browning v.*

*Baker*, 875 F.3d 444, 471 (9th Cir. 2017); *White v. Ryan*, 895 F.3d 641, 645 n.1 (9th Cir. 2018) (citing *Browning* and granting request to expand the certificate of appealability to all properly preserved claims of ineffective assistance at one phase of trial when the certificate was already partially granted for claims regarding trial counsel's conduct in the same phase).

### A. AEDPA Deference Applies to Combs' Competency Claims

To begin, Combs argues that AEDPA deference does not apply to his competency claims.  Combs argues that the standard to determine competency under California Penal Code section 1367(a) differs from the federal competency standard and, therefore, a competency determination made under California law is contrary to clearly established federal law.  Thus, he argues that de novo review applies to his competency-related claims because the California Supreme Court necessarily applied the state standard.  *See* 28 U.S.C. § 2254(d)(1).  We reject this argument because the state and federal competency standards are not materially different. *See Deere v. Cullen*, 718 F.3d 1124, 1144 & n.11 (9th Cir. 2013) (equating the California and federal competency standards).

Under clearly established federal law, "[t]o establish a violation of [the] right not to be tried and convicted while incompetent, [a defendant] must show that at the time of trial he lacked either sufficient ability to consult with his lawyer with a reasonable degree of rational understanding, or a rational and factual understanding of the proceedings against him." *Williams*, 384 F.3d at 608 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)); *see* 28 U.S.C. § 2254(d)(1).  At the time of Combs' trial, California

law provided, as it does now, that a defendant is incompetent to stand trial if "as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." Cal. Penal Code § 1367(a). Moreover, under California law, there is a presumption of competence, and the defendant has the burden to show otherwise. *Medina v. California*, 505 U.S. 437, 452–53 (1992). The Supreme Court has held that this allocation of burden does not violate a defendant's right to due process. *Id.*

Combs argues that the two standards are different because the California standard improperly focuses on a defendant's diagnoses, rather than their impact on the defendant. Combs' argument fails, however, because we have applied California Supreme Court precedent and concluded that the "goal [of a competency hearing under California law] is to determine whether 'the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.'" *Huu Thanh Nguyen v. Garcia*, 477 F.3d 716, 728 (9th Cir. 2007) (first quoting § 1367(a), and then citing the federal standard articulated in *Godinez*, 509 U.S. at 401 n.12); *see also Deere*, 718 F.3d at 1144 & n.11. Combs asserts that these cases are inapplicable because they did not consider the precise argument he makes here. But he has not cited any clearly established federal law to support his argument that the federal and state competency standards are materially different.

Instead, Combs argues that in *Madison v. Alabama*, 586 U.S. 265, 278–79 (2019), and *Cooper v. Oklahoma*, 517 U.S. 348, 368–69 (1996), the Supreme Court invalidated the competency standards of Alabama and Oklahoma, which he

argues are similar to the California competency standard. But neither of these cases suggest that California's competency standard is contrary to or an unreasonable application of clearly established federal law.[8]

Further, when interpreting Cal. Penal Code section 1367, the California Supreme Court has repeatedly held that, although the statute's text "does not match" the competency standard articulated in *Dusky* "word for word," the "two tests are identical." *People v. Stanley*, 897 P.2d 481, 512 (Cal. 1995) (quoting *James v. Superior Court*, 143 Cal. Rptr. 398, 402 (Ct. App. 1978)); *see also People v. Ary*, 246 P.3d 322, 327–28 (Cal. 2011) (determining that California's competency standard does not violate federal due process).

Combs nonetheless contends that in *In re R.V.*, 349 P.3d 68, 73 (Cal. 2015), the California Supreme Court acknowledged that the state's competency standard is materially different from the federal standard. Combs' reliance on *R.V.* is misplaced. There, the court considered the standards and procedures for determining a juvenile's competency under Cal. Welf. & Inst. Code § 709, which the court observed, was based on the federal and California standards for determining an adult's competency and

---

[8] In *Madison*, the Supreme Court considered whether an inmate with a particular diagnosis could be executed. 586 U.S. at 277–78. The Court determined that the competency analysis should focus not on a defendant's particular diagnosis, but on "a downstream consequence" of the diagnosis. *Id.* at 279. In *Cooper*, the Supreme Court found Oklahoma's competency standard unconstitutional because it required a defendant to prove incompetence by clear and convincing evidence, rather than by a preponderance of the evidence. 517 U.S. at 350, 355–56. California law does not use the clear-and-convincing standard. *Id.* at 360 & n.16, 361 n.17; *see also Rodriguez v. Superior Court*, 539 P.3d 442, 450 (Cal. 2023); Cal. Penal Code § 1369(c)(3).

described as an abbreviated form of the federal standard announced in *Dusky*. *R.V.*, 349 P.3d at 74. The California Supreme Court distinguished the juvenile and adult competency standards because the adult standard "requires a showing that the adult defendant's incompetence arose from either a mental disorder or developmental disability" as opposed to, for example, a juvenile's developmental immaturity. *Id.* The court did not, however, distinguish the adult competency standard in any meaningful way from the *Dusky* standard. *Id.*

Moreover, three years after *R.V.*, in *People v. Buenrostro*, 430 P.3d 1179, 1195–96 (Cal. 2018), the California Supreme Court rejected the argument that section 1367 facially violates due process based on the statute's textual requirement of "a mental [health] disorder or developmental disability." In *Buenrostro*, the California Supreme Court concluded that there was "no inconsistency" between section 1367 and *Dusky*. *Id.* at 1197. On habeas review, we are bound by a state court's interpretation of its law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Neither the Supreme Court nor the California Supreme Court has interpreted section 1367(a) in a manner that would render a state court's application of that standard contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Thus, Combs has failed to demonstrate that when the California Supreme Court considered his competency claims, it applied a competency standard that was contrary to federal law. *Cf. Carey v. Musladin*, 549 U.S. 70, 76 (2006) (determining that in the absence of clearly established

federal law, there was no basis to find that a state court determination was contrary to or an unreasonable application of clearly established federal law). Accordingly, AEDPA deference applies to our review of the California Supreme Court's determination of Combs' competency claims. *See* 28 U.S.C. § 2254(d).

### B. Procedural and Substantive Due Process Related to Competence

The Supreme Court has consistently held that "the criminal trial of an incompetent defendant violates due process." *Medina*, 505 U.S. at 453. Competence to stand trial and participate in one's defense is a foundational right, upon which many other rights that are essential to a fair trial rest. *See Drope v. Missouri*, 420 U.S. 162, 171–72 (1975). Therefore, a defendant must not be tried unless he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

Accordingly, a trial court must conduct a competency hearing, even if a hearing is not requested, "whenever the evidence before the judge raises a *bona fide* doubt about the defendant's competence to stand trial." *Williams*, 384 F.3d at 603. A trial court is obligated to monitor a defendant's competence throughout trial. *Drope*, 420 U.S. at 181. And even if previously found competent, a defendant may be later found incompetent to stand trial. *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007).

In reviewing the record to determine whether a trial court should have conducted a competency hearing, the reviewing court considers "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary

hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc)); *see also Williams*, 384 F.3d at 604 (review is limited to "only the evidence that was before the trial judge"). Evidence of incompetence may include "the defendant's demeanor before the trial judge, irrational behavior . . . , and available medical evaluations." *Williams*, 384 F.3d at 604. A trial court's determination that a competency hearing was not warranted is a factual finding that will only be disturbed when a reviewing court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Maxwell*, 606 F.3d at 567–68 (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by*, *Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014)).

Whether a defendant actually was incompetent at the time of trial is a substantive due process claim, and a court reviewing such a claim may consider facts and evidence that were not available to the trial court. *Williams*, 384 F.3d at 608. "However, we disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial." *Id*.

## C. Combs' Conduct While Awaiting Trial and the Resulting Medical Examinations

To place Combs' competency claims in context, we consider several incidents that took place while Combs was in jail awaiting trial, which he characterizes as suicide attempts, and which resulted in examinations by two

court-appointed medical experts. Combs received psychotropic medication and antidepressants beginning in June 1991. During an incident in February 1992, jail staff observed Combs banging his head, feet, and hands on his cell door. When deputies confronted him, Combs displayed two shanks and used them to cut his right wrist and stab the inside of his left elbow. Deputies intervened and held Combs while jail nurses treated the wounds.

At trial, one of the responding deputies, Michael Glenn, testified that Combs was combative, shouted, and kicked his cell door during the February 1992 incident. Combs prevented the deputies from entering his cell by threatening them with the shanks. Glenn testified that Combs used one of the shanks that was "a toothbrush with a razor fastened at the end" to make a superficial cut on his left wrist. Combs then threatened to stick the other shank into his eye. When the deputies did not respond, Combs jabbed the "seven-inch shank" into his right arm near the inner elbow. Combs fainted and he was later transported for medical treatment.

In a second incident, in March 1992, Combs was hospitalized for a "self-inflicted head injury." A treatment note described Combs as "stressed, irritable, [sleeping poorly], angry[,] and impulsive." Soon after, defense counsel John Hardy moved for a competency evaluation, stating that he had "doubt as to [Combs'] present competence to stand trial." The trial court granted the motion and appointed Drs. Malancharuvil and Kania to examine Combs and determine his competence. Both doctors found Combs competent to stand trial.

Specifically, in April 1992, Dr. Malancharuvil examined Combs and reviewed records from the jail. Combs said he was "condemned" and that he had "no desire or intention to

go to court."     Dr. Malancharuvil noted that Combs'
"attitude[] and speech" appeared "dangerously suicidal" and
"homicidal."   He also noted that Combs exhibited no signs
of "hallucinations, or psychotic delusions" but presented as
"impulsive, manipulative[,] and highly self-serving in his
interactions with others."     Dr. Malancharuvil considered
Combs a suicide and homicide risk due to his perception that
his situation was hopeless. He opined, however, that Combs
"fully underst[ood] the nature and seriousness of the charges
leveled against him," the "pleas" he could make, and the
court proceedings.

Dr. Malancharuvil concluded that Combs was capable of
cooperating with counsel and participating in trial, but he
was "extremely resistant to the trial process" because he
believed he would be found guilty and "sent to prison for
good."   He stated that "[a]t this time [Combs] is fully
competent" but that he could not be sure that Combs would
not "decompensate" before or during trial.     Dr.
Malancharuvil further concluded that Combs did not
"suffer[] from any psychotic or organic brain processes" that
impeded his competence to stand trial.   He noted, however,
that Combs had a "severe form of personality disorder" and
that "[b]ecause he ha[d] decided" that going to trial was
against his interest, he used "intimidation, manipulation[,]
and decompensation as methods of resisting trial."   He
opined that Combs was likely to be "disruptive during the
trial process, particularly in the early stages," and that he
should be watched before and during trial because he was
likely to try to incite officers to fight.   Dr. Malancharuvil
emphasized that Combs' lack of cooperation with the trial
process and his determination to "nut up during trial" were
"not due to mental incompetence, but because he ha[d] found
it beneficial to him."

Dr. Kania also examined Combs, and his April 17, 1992 report is materially consistent with Dr. Malancharuvil's assessment. Dr. Kania evaluated Combs and reviewed his health records from the West Valley Detention Center. Dr. Kania noted that, after Combs injured himself, he was placed on suicide watch until March 24, 1992. Dr. Kania observed that the jail psychiatrist who placed Combs on suicide watch reported that Combs was "combative in order to get attention." Dr. Kania noted that Combs was diagnosed with major depression after the February 1992 incident during which he cut his arm.

Dr. Kania further noted that Combs denied a history of physical or sexual abuse but suggested that he was emotionally abused. Combs reported being in special education programs in school, that he had no serious behavior problems at school, and that he had friends. Dr. Kania noted that Combs had been treated in the past at Bethesda Hospital and Halcyon Center and that he reported three suicide attempts, most recently on February 19, 1992. Combs denied suicidal ideation but told Dr. Kania he would provoke an officer into shooting him.

Dr. Kania found that Combs showed no signs of thought disorganization, "persecutory ideation," delusional beliefs, or deficits in abstract thinking or goal direction. He determined that Combs' attention, concentration, and comprehension were unimpaired and that he displayed "average intellectual ability." He concluded that Combs was "not suffering from a psychotic disorder that would interfere with his ability to think rationally or express himself in a coherent manner." Dr. Kania further concluded that Combs was "able to understand the nature and purpose of the proceedings taken against him," the seriousness of the charges, that the consequences could be the death penalty or

life without parole, and the identities and functions of the people in the courtroom, including his attorneys. He was capable of cooperating with counsel in presenting a defense "should he decide to do so."

Dr. Kania explained that Combs was frustrated with his legal status and that he "intend[ed] to disrupt his trial" to provoke the deputies to kill him. Therefore, Dr. Kania recommended "preventive steps" to reduce the chance of this behavior. Dr. Kania opined that, although Combs was "suicidal at the present time," he remained capable of "cooperat[ing] in a rational manner" but "may consciously choose to be uncooperative."

On April 21, 1992, based on Dr. Kania's report, jail staff placed Combs on suicide watch. In a third incident, on April 23, the day before Combs' competency hearing, deputies found Combs seated on the floor of his cell next to two razors and an apparent suicide note. He had a contusion on his forehead and bloody cuts on the inside of his left elbow. He was transported to the county hospital. At the competency hearing the next day, the court found Combs competent based on the assessments of Drs. Malancharuvil and Kania.

In a fourth incident, on June 13, 1992, Combs had a standoff with jail deputies after he tied his food door shut with a rope and threatened to slit his throat with razors if deputies attempted to enter his cell. After additional deputies and the jail nurse responded, Combs obeyed orders to put down the razors and lay face down on his bunk, allowing the deputies to enter his cell. Combs was taken to the hospital for treatment.

In a fifth incident, on August 13, 1992, while his trial was ongoing, Combs had another standoff with jail deputies, during which he cut himself and required medical treatment.

The bailiff informed the trial court that Combs had attempted suicide, would not be available in court for "at least a couple of weeks" due to the seriousness of his injuries, and would be "in isolation" and "watched." During the penalty phase of his trial, a responding deputy described the August 1992 incident in which Combs had barricaded his cell, splashed water on the floor to make it slippery, and dressed in a makeshift poncho with strips of cloth around his arms and another strip tied as a headband. Combs was armed with razors and had cut his hands and smeared the blood on his face in stripes like "war paint." Combs had also made a weapon from a sharpened broom handle. He told the deputy that he was tired of going to court and frustrated by "dry runs," meaning days when he was taken to the courthouse and nothing happened. "He said he wasn't going to go to court" and that, if the deputies came to get him, he would fight them.

A jail sergeant who responded to the incident testified that he persuaded Combs to cooperate by pointing out that, because of the cuts on his hands, he would not be taken to court but to the "medical segment" for treatment. The sergeant also recounted an earlier incident during which Combs injured himself by breaking the glass part of his cell door and required treatment at a hospital.

Combs argues that, based on these incidents, trial counsel should have moved for an additional competency assessment, and the trial court should have ordered a second competency hearing.

## D. Procedural Due Process Claim Based on the Trial Court's Failure to Order a Second Competency Hearing

We conclude that Combs has failed to make a substantial showing that the California Supreme Court's denial of his procedural due process claim was unreasonable. *See* 28 U.S.C. § 2254(d)(2). Regardless of when the trial court learned of these jail incidents, Combs has failed to raise a debatable claim that the incidents warranted another competency determination. As discussed in Part V.C, the reports prepared by the independent, court-appointed medical experts, Drs. Malancharuvil and Kania, were materially the same, and both opined that, although Combs was "suicidal," he was competent to stand trial because he understood the nature of the charges, the proceedings, and the potential sentences, and he was capable of cooperating with counsel to prepare his defense if he chose to do so. Both appointed medical experts explained that Combs became "suicidal and disruptive" as his trial date approached because he thought trial was "against his interest." Both predicted that Combs would be disruptive during the trial process and might try to provoke deputies. The incidents in the jail occurred in April, June, and August 1992, shortly after the medical experts provided their April 1992 reports, and the nature of the incidents is consistent with the experts' predictions that Combs would engage in disruptive behavior to avoid trial.

Consistent with Supreme Court precedent, we have recognized that suicide attempts and acts of serious self-harm should be considered when determining whether a trial court had, or should have had, bona fide doubts regarding a defendant's competency. *See Drope*, 420 U.S. at 181; *Maxwell*, 606 F.3d at 570–71; *McMurtrey*, 539 F.3d at 1119.

We have also determined, however, that when a defendant's disruptive, self-harming, and even suicidal actions are part of a pattern of chosen noncooperation, and mental health experts have rejected those actions as a basis for an incompetency finding, such actions do not require an additional competency evaluation. *See Amaya-Ruiz v. Stewart*, 121 F.3d 486, 491 (9th Cir. 1997) (determining that a petitioner's disruption of hearings by raising his voice, refusing to wear civilian clothes for court, and attempting to hang himself did not raise a bona fide doubt regarding his competency when two court-appointed experts had found him competent and his actions were consistent with a chosen "strategy of noncooperation"), *overruled on other grounds by*, *United States v. Preston*, 751 F.3d 1008, 1019–20 (9th Cir. 2014) (en banc). Further, even assuming that the trial court was aware of all the jail incidents at the time of the guilt phase, it could have reasonably determined that a second competency hearing was not warranted based on defense counsel's decision not to move for a second competency hearing, even after the August 13, 1992 incident. *See Medina*, 505 U.S. at 450 (recognizing that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense").

Additionally, although another expert, Dr. Crinella, testified in the guilt phase regarding Combs' mental and cognitive impairments, he did not opine that Combs was incompetent and did not challenge the findings of Drs. Malancharuvil or Kania. Instead, Dr. Crinella testified that he could not say whether Combs met the legal definition of insanity, but that due to his mental impairments, Combs viewed the world differently than a normal person would. Dr. Crinella testified that Combs "mutilat[ed] himself" because he was "chronically cortically depressed."

Although the trial court was aware that Combs suffered from mental illness and had engaged in self-harm while in jail pending his trial, given the predictions in the medical experts' April 1992 reports, the court was not required to conduct a second competency hearing during the guilt phase. *See Drope*, 420 U.S. at 180; *Williams*, 384 F.3d at 603–07; *Maxwell*, 606 F.3d at 570–71.

## E. Ineffective Assistance Based on Failure to Request Additional Competency Hearings

We also conclude that Combs has not established a debatable claim that counsel was ineffective for failing to request additional competency hearings. The evidence available to counsel at the time of the guilt and penalty phases of trial indicated that Combs was competent. The April 1992 reports from Drs. Malancharuvil and Kania and the opinions of Drs. Crinella, Graves, and Oshrin indicated that Combs was legally competent and that he did not suffer from a major mental impairment beyond antisocial personality disorder. For example, Dr. Oshrin testified in the penalty phase that Combs had no mental disorder that would prevent him from competently standing trial. In addition to the doctors' opinions, Nurse Hunt testified that Combs admitted he harmed himself to manipulate jail staff into diagnosing him with mental impairments that might lead to reduced culpability.

Combs argues that trial counsel was ineffective for failing to provide Drs. Malancharuvil and Kania with additional background records. The State contends that because Combs presents this argument for the time on appeal, we should not consider it. *See Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) ("Generally, we do not consider arguments raised for the first time on

appeal."). We need not resolve this issue because, even if exhausted, this claim lacks merit because there is no indication that either Drs. Malancharuvil or Kania requested additional background information about Combs, and neither opined that they were unable to form an opinion with a reasonable degree of medical certainty based on the records that were available to them and their in-person evaluations of Combs. *See Hendricks*, 70 F.3d at 1037–39 (holding that counsel was entitled to rely on the opinions of experts and that, in the non-penalty-phase context, a failure to provide background records is not deficient performance where the expert did not request them).

Further, to the extent Combs asserts that trial counsel was ineffective for failing to discover and present evidence to Drs. Malancharuvil and Kania that Combs had FASD, which Combs argues could have indicated his incompetency, this argument fails because counsel's investigation into Combs' biological background was not deficient, as previously stated in Part IV.C.

Therefore, we conclude that Combs has failed to present a debatable claim that the California Supreme Court's denial of his procedural due process claim was unreasonable, and we deny his request for a certificate of appealability for this claim. We also deny Combs' request for a certificate of appealability for his claim that counsel was ineffective for failing to request a second competency hearing during the guilt phase. To the extent that Combs argues that counsel was ineffective for failing to request an additional competency hearing during the penalty phase, we grant a certificate of appealability because the penalty-phase claim falls within "higher level of generality" of the certified penalty-phase claim of ineffective assistance of counsel.

*Browning*, 875 F.3d at 471. However, we affirm the district court's denial of this claim.

## F. Substantive Due Process Claim Based on Competency at Trial

Combs also asserts a substantive due process claim on the grounds that the evidence developed during the state habeas corpus proceedings demonstrates that he was incompetent at the time of trial. *See Williams*, 384 F.3d at 608 (setting forth the competency standard). Specifically, Combs contends that the reports of Drs. Malancharuvil and Kania were based on California's competency standards and, therefore, the experts only determined whether Combs had a diagnosable mental impairment without conducting "any further inquiry as to whether Combs 'had the present ability to consult with his lawyer.'"

Combs' argument is not supported by the record. The reports of Drs. Malancharuvil and Kania both address whether Combs had a diagnosed mental impairment, as well as his background, medications, presentation during their examinations, education, intelligence, history of substance use, physical health, and reported reasons for his actions while in jail pending trial. Both medical experts determined that Combs was able to understand the charges and the nature of the proceedings and to cooperate in his defense if he chose to do so. These determinations were not limited to whether Combs had a particular diagnosis.

Combs also faults the doctors for failing to find him incompetent despite knowing that he was taking psychotropic medications. There is, however, a difference between a defendant having a mental impairment that "affected his decision" and one that "affected his capacity to understand his situation and make rational choices." *Deere*,

718 F.3d at 1147.  Here, Combs has not demonstrated that his medications impaired his ability to understand the proceedings and assist with his defense.  *See Williams*, 384 F.3d at 608.  Additionally, Combs told a prison nurse that he "really was not trying to harm himself" but instead was trying to manipulate the staff to obtain a "[m]ental health diagnosis" or other benefits, and he was taken off medication in October or November 1992.  To the extent that the California Supreme Court rejected Combs' characterization of Drs. Malancharuvil's and Kania's opinions, it was reasonable for it to do so.

Combs also argues that evidence presented in his state habeas proceedings regarding his history of suicide attempts, mental impairments, organic brain damage, and indications of fetal alcohol spectrum disorders, demonstrates that he was incompetent at the time of trial.  Combs, however, had been found competent at the time of trial.  And no treatment provider had opined that Combs' mental and cognitive impairments rendered him incapable of understanding his circumstances or cooperating with counsel to prepare his defense.  Additionally, some treatment providers and Dr. Oshrin opined that Combs was manipulative and malingering.  *See, e.g.*, *Combs*, 101 P.3d at 1016–18.  The defense experts were aware of Combs' history of suicidal behavior, mental impairments, and organic brain damage, but none found Combs incompetent.

Moreover, although Combs presented evidence in the state habeas proceedings about his organic brain dysfunction, mental illness, and fetal alcohol spectrum disorders, only Dr. Khazanov opined that Combs was "severely impaired" in his ability to conform his behavior "to the requirements of the law," comprehend the consequences of his actions, and assist in his defense.

Additionally, Dr. Khazanov's opinion focused on whether Combs was incompetent or legally insane at the time of Lee's murder, rather than at the time of trial. For example, Dr. Khazanov explained that Combs' impairments were exacerbated by "the influence of [amphetamines]" when he killed Lee. Although Dr. Khazanov also opined that Combs' ability to assist in his defense was impaired, his opinion was based, in part, on Combs' poor functioning on memory tests. But Dr. Khazanov did not acknowledge that Combs had consistently performed well on memory testing throughout his life, including at the time of trial.

Although the experts in the state habeas proceedings, such as Dr. Novick Brown, generally opined that Combs' fetal alcohol spectrum disorders "diminished his decision-making capacity," these opinions do not address Combs' competence to stand trial. *See United States v. Garza*, 751 F.3d 1130, 1135–36 (9th Cir. 2014) (explaining that "even some medical evidence of an extraordinarily debilitating condition," without more, "does not rise to the level of substantial evidence" showing incompetence). Moreover, to the extent that these experts suggested that Combs was incompetent to stand trial, these retrospective opinions are disfavored on habeas review when compared to contemporaneous evaluations of Combs at the time of trial. *See Williams*, 384 F.3d at 608; *Boyde*, 404 F.3d at 1165–67.

Because the California Supreme Court could have reasonably determined that the record did not raise a significant claim that Combs actually was incompetent at the time of trial, we conclude Combs has failed to raise a debatable substantive due process claim, and we deny Combs' request for a certificate of appealability on this claim.

## G.  Sixth Amendment Claim Based on Juror Bias

Combs argues his Sixth Amendment rights were violated because an empaneled juror engaged in misconduct by omitting from her prospective juror questionnaire that she had been hospitalized in a psychiatric hospital over twenty years earlier, was diagnosed with bipolar affective disorder, and was prescribed medication.  He contends that these omissions concealed bias because the questionnaire asked whether the juror "ever consulted a psychiatrist, psychologist, or marriage and family counselor," and whether she was "familiar with psychological testing," but the juror answered "no" to both questions.

The Sixth Amendment "right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  An impartial jury is one "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  Voir dire protects the right to an impartial jury by "exposing possible biases," and the truthfulness of prospective jurors is critical to this process.  *Id.*  The presence of even a single "unduly biased or prejudiced" juror violates this right.  *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (quoting *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977)).  To obtain a new trial based on a juror's failure to disclose information, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

Under AEDPA's deferential standard, the California Supreme Court's summary denial of Combs' juror misconduct claim reasonably could have been based on the lack of competent support. To support this claim, Combs relied on the declaration of Federal Public Defender staff investigator Ellen Turlington recounting what the juror told her during two interviews in May 2006.[9]

Under California law, a juror's statement to an investigator is hearsay that does not fall under any exception to the hearsay rule. *People v. Hayes*, 989 P.2d 645, 674 (Cal. 1999). The California Supreme Court was not required to accept a hearsay declaration as evidence, particularly when Combs did not argue that it was admissible under an exception to the hearsay rule. *Id.* And "[u]nless the issue has been conceded by the respondent, habeas relief cannot be granted on the basis of inadmissible hearsay." *People v. Montoya*, 57 Cal. Rptr. 3d 770, 779 n.5 (Ct. App. 2007) (citing *In re Fields*, 800 P.2d 862, 866 (Cal. 1990)). Therefore, Combs failed to present any competent evidence to the California Supreme Court in his state-court habeas proceedings to support his juror misconduct claim. *See People v. Cox*, 809 P.2d 351, 399 (Cal. 1991) (determining that neither a juror's unsigned affidavit nor the defense investigator's affidavit recounting the juror's statements to the investigator constituted competent evidence of juror misconduct).

Combs contends that if the California Supreme Court denied his juror misconduct claim because it was based on hearsay, its determination was unreasonable under § 2254(d) because neither California law nor federal law prohibits the reliance on hearsay evidence to state a prima facie case for

---

[9] Combs erroneously attributed the declaration to the juror.

relief.  Combs argues that the California Supreme Court was required to assume the truth of the allegations in the state habeas petition and, therefore, it was required to accept the Turlington declaration.  Combs misstates California habeas procedures.  Although the California Supreme Court "generally assumes the allegations in the petition to be true, [it] does not accept wholly conclusory allegations." *Pinholster*, 563 U.S. at 188 n.12 (citing *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995)).  Therefore, a state habeas petitioner generally cannot establish a prima facie case by relying on hearsay evidence.  *See Montoya*, 57 Cal. Rptr. 3d at 779 n.5; *see also People v. Mora*, 420 P.3d 902, 956 (Cal. 2018) ("[H]earsay is ordinarily 'not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct.'" (quoting *Hayes*, 989 P.2d at 672)).

The California Supreme Court has also stated that declarations may "serve to persuade the court of the bona fides of the allegations" in the petition, and the court may take the allegations as true if the respondent "does not dispute the material factual allegations."  *In re Fields*, 800 P.2d at 866 & nn.2–3 (making clear, however, "that a court has [no] discretion to base its decision on disputed issues of fact in a habeas corpus proceeding upon inadmissible hearsay").  Here, the State argued that the Turlington declaration was inadmissible hearsay and, therefore, Combs failed to state a prima facie case for relief.  Under these circumstances, the California Supreme Court was not obligated to make further inquiry into Combs' allegation of juror misconduct.  *See Mora*, 420 P.3d at 956 (holding that a court "does not abuse its discretion in declining to hold an evidentiary hearing or denying a motion for a new trial when the only basis to grant such a hearing or trial is . . . a defense attorney's hearsay assertions").

Combs' reliance on *In re Hitchings*, 860 P.2d 466 (Cal. 1993) (in bank), is unavailing. There, the California Supreme Court issued an order to show cause after it determined that the petitioner stated a prima facie case for habeas relief based on hearsay declarations from a juror's co-workers recounting conversations with the juror. *Id.* at 467–68. Unlike this case, however, there was no indication in *Hitchings* that the state had opposed the declarations on hearsay grounds. *See id.*; *see also In re Fields*, 800 P.2d at 866 n.2.

Relying on *Duvall*, Combs argues that requiring declarations to satisfy rules of evidence is a "draconian" application of the general pleading rules applicable to state habeas petitions that "defeat[s] the ends of justice." 886 P.2d at 1266. In *Duvall*, the California Supreme Court stated that general pleading rules should not be enforced in a "draconian fashion" when access to critical information is limited or denied to one party or when the resolution of the case hinges on witness credibility. *Id.* at 1265–66. The court clarified that a respondent is required to "plead facts in the return only if reasonably available." *Id.* at 1266. The court, however, did not suggest that it was relaxing or obviating the hearsay rules as applied to declarations. *See generally id.* at 1265–66.

Here, in its informal response (or return) to Combs' state habeas petition, the State specifically argued that the California Supreme Court should reject Turlington's declaration as hearsay, and Combs did not argue that a hearsay exception applied. Thus, the California Supreme Court considered the pleadings in the context of the State's uncontested hearsay objection to Turlington's declaration. Because the California Supreme Court could have refused to accept the Turlington declaration as hearsay, and because

there was no other evidence regarding the juror's conduct, the court could have reasonably denied the juror bias claim for failure to state a prima facie claim for relief.

Additionally, summary denial was not unreasonable under 28 U.S.C. § 2254(d). Although we consider whether state law provides a theory that could have supported the California Supreme Court's decision, the ultimate issue under § 2254(d) is whether "fairminded jurists could disagree" that such a theory is inconsistent with Supreme Court precedent. *Richter*, 562 U.S. at 102. The Supreme Court has rejected evidence based on hearsay affidavits that were presented years after trial and without explanation. *See, e.g.*, *Herrera v. Collins*, 506 U.S. 390, 417–18 (1993). And we likewise have determined that hearsay affidavits, prepared and submitted years after trial, were not sufficient evidence for granting habeas relief. *See Murtishaw v. Woodford*, 255 F.3d 926, 958–59 (9th Cir. 2001).

Combs argues that in *McDonough* and *Phillips*, the Supreme Court held that a petitioner establishes a prima facie case, thus triggering the requirement for a state court to hold an evidentiary hearing, when a petitioner submits hearsay affidavits alleging juror misconduct. His argument fails because it ignores *Pinholster*, in which the Supreme Court approved the California Supreme Court's procedure for summarily denying habeas corpus review. *Pinholster*, 563 U.S. at 187–88, 188 n.12. Combs' argument also misstates the holdings of *McDonough* and *Phillips*. In *McDonough*, the Court did not address whether a court would be required to initiate further inquiry based on a hearsay affidavit. 464 U.S. at 550–51, 551 n.3 (noting that the parties agreed about the content of the conversation with a juror). Similarly, *Phillips* did not hold that a court must

hold a hearing based on hearsay statements.  *See* 455 U.S. at 212–13.

Because the California Supreme Court could have, consistent with California law, refused to accept the Turlington declaration as hearsay, and because there was no other evidence regarding the juror's conduct, the California Supreme Court reasonably could have denied the claim of juror bias for failure to state a prima facie claim for relief. Combs has not shown that fair minded jurists could disagree as to whether this theory is inconsistent with a prior decision of the Supreme Court, and thus he has not met the standard for a certificate of appealability.  *See Lambright*, 220 F.3d at 1025.  Accordingly, we deny a certificate of appealability on this issue.

## VI.  Conclusion

We affirm the district court's denial of habeas corpus relief.